CORNERSTONE BIBLE CHURCH, and
James Bzoskie, Plaintiffs,

v.

CITY OF HASTINGS,
MINNESOTA, Defendant.

Civ. No. 4–89–78.

United States District Court,
D. Minnesota,
Fourth Division.

June 21, 1990.

Jordan Lorence, Washington, D.C., and Wendel R. Bird, Atlanta, Ga., for plaintiffs.

James M. Hamilton, Hertogs, Fluegel, Sieben, Polk, Jones & LaVerdiere, P.A., Hastings, Minn., for defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on the defendant's motion for summary judgment. Plaintiffs' claim defendant has violated plaintiffs' constitutional rights to freedom of speech, freedom of association, due process, equal protection and the free exercise of religion. For the reasons set forth herein, defendant's motion will be granted.

## FACTUAL BACKGROUND

### A. *The Dispute*

Plaintiff Cornerstone Bible Church ("Church") is a conservative evangelical Christian Church which was founded in 1983. Plaintiff James Bzoskie is the pastor of the Church and a resident of Hastings, Minnesota. Defendant City of Hastings, Minnesota ("Hastings" or "City") is a city which was created under the laws of Minnesota and was acting under color of state law at all times relevant to the litigation which underlies this motion.

The dispute which led to the initiation of this lawsuit centers on the location of the Cornerstone Bible Church within the City of Hastings. The Church first held its meetings at Bzoskie's home. As membership increased, however, the Church rented space at the Hastings Senior High School and held its meetings there. On October 1, 1984, the Church began meeting for worship services at a site known as the Caturia Building. Eventually the Caturia Building became the Church's exclusive location and the Church was still meeting there on a regular basis at the time this lawsuit began.

The City of Hastings has a comprehensive zoning ordinance which controls the location of various types of buildings and organizations throughout the City. The most important provisions of the zoning ordinance for purposes of the instant suit relate to the distinction between commercial and residential property and the uses to which commercial and residential property may be put. Described in the most general terms, the zoning ordinance permits churches in most residential areas and prohibits churches in commercial and industrial areas.[1] The Caturia Building is located in downtown Hastings which is a commercial zone under the Hastings ordinance.

The City maintains that it was not until late 1986 that it learned that the Church had leased space in the Caturia Building. On November 3, 1986, City Planning Director Thomas K. Harmening informed the Church that its use of the Caturia Building violated the City's ordinance and that it should discontinue such use. Harmening informed the Church that it had a right to appeal his determination to the city council which would act as the Hastings Board of Zoning Adjustment and Appeals. The Church did not appeal Harmening's decision, but instead began pursuing negotiations for the possible purchase of a former theatre which was also located in a commercial zone. At the outset of the negotiations the Church requested that the zoning ordinance be amended so as to allow the Church to occupy the theatre should the negotiations prove successful. Harmening recommended to the planning commission that it deny the Church's request and after a public hearing on the matter on December 22, 1986, the Commission unanimously decided not to amend the zoning ordinance. On January 5, 1987, the city council considered the Church's rezoning request and, based on the planning commissions' recommendations, denied the Church's application. Ultimately, the Church did not purchase the theatre.

In addition to the former theatre, the Church has negotiated or attempted to negotiate the purchase of a number of other facilities in various other locations in Hastings. Among the other properties that have captured the Church's interest is a parcel located on Tenth Street. Because the Tenth Street property is located in a commercial zone, the Church requested the City to rezone the property to permit the Church's intended use. This request was made while negotiations were pending on the property. After a hearing on the mat-

1. The provisions of the Hastings zoning ordinance are presented in detail in Section B *infra*.

ter the planning commission recommended that the Church's request be denied. Subsequently, the city council had its own hearing on the matter and unanimously decided to accept the recommendation of the planning commission. Although the City had denied the Church's rezoning request, the Church purchased the Tenth Street property in the fall of 1984. Subsequent to closing the sale of the property the Church again requested the City to rezone the property so as to allow the property to be used as the site of the Church. Again, the Church's request was denied.

The Church also expressed interest in purchasing the property located at 515 East Third Street in Hastings. The Third Street property is zoned for industrial use but the Church had requested the City to reclassify it as a residential zone in which a church is a permitted use. With respect to this property the city planner recommended approval of the Church's request. The city council approved the Church's request and held the first two of three required readings of the amendment to the zoning ordinance in September and October of 1987. The city council had scheduled the third and final reading of the proposed amendment, after which the requested amendment would have been effective. Prior to this reading, however, the Church withdrew its request and thus the rezoning amendment never became effective.

In addition to the negotiations referred to in the preceding three paragraphs, the Church has attempted to lease or buy various other facilities in Hastings. For one reason or another, however, the transactions have not been completed and the Church has remained at the Caturia Building. Since late 1986 the Church has requested, and the City has granted, numerous extensions which have allowed the Church to remain at the Caturia Building and continue to operate from that location. The last extension which the City granted to the Church expired on January 1, 1989. On the expiration of the extension the Church was ordered to vacate the Caturia Building. On January 12, 1989, Harmening informed the Church that it was not in compliance with the zoning ordinance. In response to the City's order to vacate, the Church filed the lawsuit which underlies this motion. The Church claims that the City has violated its constitutional rights to freedom of speech, freedom of association, equal protection, due process and the free exercise of religion. Defendant moves for summary judgment on each of plaintiffs' claims.

### B. *The Zoning Ordinance*

The specific provisions of the Hastings Zoning Ordinance at issue in this dispute are the residential zones in which churches are a permitted use (zones R–1 through R–5), the commercial zone in which the Caturia Building is located (zone C–3) and the industrial zone in which the Church's Tenth Street property is located (zone I–2). In pertinent part, the Hastings Zoning Ordinance provides:

SEC. 10–11.R–1–LOW DENSITY RESIDENCE

Subd. 1.   Intent.

The intent of this Chapter in establishing a low density residence district is to provide for the normal outward residential expansion of Hastings according to current standards of development, and to protect the desired quiet living environment from encroachment from potential conflicting uses.

Subd. 2.   Uses Permitted.

A.   One–Family Detached Dwellings.

. . . .

B.   Public Parks, Playgrounds, Country Clubs, Athletic Fields and other recreational uses of a non-commercial nature.

C.   Churches and public and parochial schools.

D.   Customary home occupations pursuant to the standards set forth in Section 10.02, Subd. 11 and Section 5.71.

. . . .

E.   Customary accessory uses if incidental to the foregoing principal uses such as private garages, screen houses, signs and play equipment.

Subd. 3.  Uses by Special Permit.

A.  Fire Stations, Hospital, Day Care Center, Old Age Home, Rest Home, and Cemetery.

. . . .

SEC.  10.12.R–2–MEDIUM DENSITY RESIDENCES

Subd. 1.  Intent.

The intent of this Chapter in establishing a medium density residence district is to protect those residential areas within Hastings that were developed in most part prior to World War II, encroachment from potential conflicting uses, and to provide for future residential and related development consistent with proper existing development and with minimum standards for the provision of health, light, air and visual appeal.

Subd. 2.  Uses Permitted.

A.  Same as permitted in the R–1 Low Density Residence District.

B.  Two-family dwellings, including both new construction and conversions of existing family dwellings.

. . . .

C.  Conversion of single dwellings to multiple family dwellings.

D.  Farmsteads and agricultural operations including residences of the farm owners or tenants and their immediate families subject to Subdivision 5 of Section 10.03, provided all outside storage is fenced in such a manner so as to screen the stored material from view when observed from the public street or adjoining lots.

E.  Fire Station, Retirement and Nursing Homes, Day Care Center, Old Age Home, and Library.

. . . .

F.  Bed and Breakfast lodging facilities provided the following criteria are adhered to:

. . . .

Subd. 3.  Uses by Special Permit.

A.  Short Term Residential Emergency Shelters for more than six persons but not more than eighteen persons subject to the following:

. . . .

SEC.  10.13.R–3–MEDIUM–DENSITY RESIDENCE.

Subd. 1.  Intent.

The intent of this Chapter in establishing a moderate high density residential district is in recognition of the growing demand for rental housing in Hastings and of the desire to provide for Townhouse, Quadriminium, and 4–Plex housing upon fairly sizeable tracts of land, thereby allowing increased "design flexibility" and a more compatible land use development pattern.

Subd. 2.  Uses Permitted.

A.  Townhomes, Townhouses, Quadriminium, 4–Plex and Single Family Dwelling, when part of a PRD [Planned Residential Development].  Applicant must make application required by Subdivision 6 of Section 10.07.

. . . .

B.  Nursing Homes, Retirement Homes, Dormitories, Public and Parochial Schools and Churches, Fire Stations, professional offices, Day Care Center, Old Age Home, Library, Gift or Craft Shop and similar uses of a public service nature.

. . . .

C.  Duplexes (Two–Family Dwellings)

D.  Customary Accessory Uses incidental to the foregoing principal uses such as private garages, identifying signs, and recreational facilities.

. . . .

E.  Customary Home Occupations that are allowed only in single family detached dwellings and two-family dwellings and in accordance to Section 10.02, Subd. 11.

. . . .

Subd. 3.  Uses by Special Permit.  None.

F.  Photography Studios are allowed only in single family detached dwellings and in accordance with the parking requirements as stipulated in Section 10.02, Subd. 4V.

. . . .

## SEC. 10.14.R–4 MEDIUM DENSITY RESIDENCES.

Subd. 1.   Intent.

The intent of this Chapter in establishing a medium density residence district is in recognition of the growing demand for rental housing in Hastings and of the desire to encourage high quality apartment developments less than three stories in height in strategic locations within the City.

. . . .

Subd. 2.   Uses Permitted.

Same as permitted in the R–3.

. . . .

Subd. 3.   Uses by Special Permit.   None.

## SEC. 10.145 R–5 HIGH DENSITY RESIDENTIAL

Subd. 1.   Intent.

The intent of this Chapter in establishing a high density residential district is in recognition in the growing demand for rental housing in Hastings and of the desire to encourage high quality apartment developments greater than three stories in height.

Subd. 2.   Permitted Uses.

Same as permitted in R–4.

Subd. 3.   Uses by Special Permit.   None.

. . . .

## SEC. 10.17.C–3 COMMUNITY–REGION COMMERCE.

Subd. I.   Intent.

The intent of this Chapter in establishing a community-regional commerce district is in recognition of the existing downtown commercial development and of the need for its future expansions, rehabilitation and redevelopment.

Subd. 2.   Uses Permitted.

A.   Commercial establishments including, but not limited to, the following:

  (1) Retail establishments such as grocery, hardware, drug, clothing and furniture stores, eating and drinking places, and franchise auto dealers.

  (2) Personal services such as laundry, barber, shoe repair shop and photography studio.

  . . . .

  (3) Offices: Administrative, Executive, Professional, Medical and Research, without merchandising services.

  . . . .

  (4) Finance, insurance and real estate services.

  (5) Repair services such as jewelry and radio and television repair shops, but not auto repair.

  (6) Entertainment and amusement services, such as motion picture theatre and bowling alley.

  (7) Lodging services such as hotel and motel.

B.   Public and Semi–Public Buildings such as post office and fire station and City Hall.

C.   Private Clubs.

D.   Apartments provided that they are located above the first floor level.

E.   Automobile parking lots.

F.   Accessory uses incidental to the foregoing principal uses such as off-street parking and loading areas, signs, storage of merchandise, and wholesaling when incidental to a permitted use.

Subd. 3.   Uses by Special Permit.

A.   Automobile service stations and motor vehicle repair and wash.

B.   Drive-in establishments.

  . . . .

C.   Creameries.

  . . . .

D.   Small Animal Clinics, excluding establishments with outside runs and non-patient overnight boarding.

  . . . .

## SEC. 10.20.I–2 GENERAL INDUSTRY.

Subd. 2.   Intent.

The intent of this Chapter in establishing a general industry district is in recognition of existing "heavy" industrial development within the community and of the desirabili-

ty of reserving additional land for possible new, expanded or relocated industries of similar nature. It is intended that land zoned for general industry would be located such that conflict with incompatible uses would be minimized.

Subd. 2. Uses Permitted.

A. All fabricating, manufacturing, processing, production, excavation or storage of materials, goods and products.

B. Wholesaling.

C. Accessory uses incidental to the foregoing principal uses.

Subd. 3. Uses by Special Permit.

Commercial recreational uses.

. . . .

## DISCUSSION OF LAW

█ Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This standard mirrors the standard for a directed verdict under Rule 50(a) of the Federal Rules of Civil Procedure, which is that the trial judge must direct a verdict, if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Stated in the negative, summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248, 106 S.Ct. at 2510.

The parties do not dispute that the City was acting under color of state law at all times pertinent to the litigation which underlies this motion. Consequently, the parties agree that the City must comply with the dictates of the constitutional clauses which the plaintiffs invoke.

## A. *Free Speech*

█ In general terms, the Hastings Zoning Ordinance allows churches to be established in only its various residential zones and prohibits land located in the commercial or industrial zones labeled "C–3" or "I–2" to be used as the location of churches. The Church claims that this relegation of churches to the residential zones is a violation of its right to free speech under the first amendment to the United States Constitution.

The free speech clause of the first amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const.Amend. I. At the outset of the first amendment analysis, the court notes that the Hastings Zoning Ordinance does not completely prohibit the establishment of churches within Hastings; rather, the ordinance specifies locations in which churches are a permitted use. In this respect, the Hastings ordinance is similar to the ordinance at issue in *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). In *Renton*, the United States Supreme Court stated:

The Renton ordinance, like the one in [*Young v.*] *American Mini Theatres* [427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) ], does not ban adult theatres altogether, but merely provides that such theatres may not be located within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school. The ordinance is therefore properly analyzed as a form of time, place, and manner regulation.

*Id.* at 46, 106 S.Ct. at 928 (citations omitted). The Hastings ordinance is similar to the *Renton* ordinance in that it does not ban churches altogether but merely provides that churches be located in certain areas within the City. Accordingly, the ordinance is properly analyzed as a form of time, place, and manner regulation.

█ Less than a year ago, the United States Supreme Court reaffirmed its previous holdings with respect to time, place, and manner restrictions on free speech. In *Ward v. Rock Against Racism*, —— U.S.

——, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), the Court stated:

> Our cases make clear ... that even in a public forum, the public may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."

*Id.* 109 S.Ct. at 2753 (citations omitted). The court will examine each of these three requirements in turn.

The first requirement under the free speech clause is that the ordinance must be justified without reference to the content of the regulated speech—i.e. the ordinance must be content-neutral. In *Ward,* the Supreme Court indicated that the purpose of an ordinance is the paramount consideration in determining content neutrality:

> The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.

*Id.* at 2754 (citations omitted).

In *Ward,* the Supreme Court considered the constitutionality of a New York City ordinance aimed at regulating the volume of amplified music originating from a bandshell in Central Park. New York City promulgated specific use guidelines for the bandshell in an attempt to harmonize the various uses to which Central Park is put. Of particular concern to the City was the use of a large grassy area known as the "Sheep Meadow" which lies within the sound range of the bandshell but which is often used for activities other than listen-ing to music. In considering the purpose of the New York ordinance, the Court held:

> The principal justification for the sound—amplification guideline is the City's desire to control noise levels at bandshell events, in order to retain the character of the Sheep Meadow and its more sedate activities, and to avoid undue intrusion into residential areas and other areas of the park. This justification for the guideline "ha[s] nothing to do with content," and it satisfies the requirement that time, place, or manner regulations be content-neutral.

*Id.* (citations omitted).

Like the noise ordinance in *Ward,* the Hastings Zoning Ordinance is justified without reference to the content of the speech which it regulates. As indicated in the "intent" sections of the above quoted provisions of the Hastings ordinance, the purpose of the zoning ordinance is to establish various zones within the City in which certain land may be put to particular uses which will not conflict with the manner in which other land is used. The ordinance makes geographic divisions which will allow the City to pursue downtown commercial development and reserve space for industrial use while maintaining the "residential" quality of certain residential areas.

The content neutrality of the Hastings ordinance becomes even clearer when compared to the ordinance at issue in *Renton.* In describing the ordinance at issue in that case, the Court noted that "[a]t first glance, the Renton ordinance, like the ordinance in *American Mini Theatres,* does not appear to fit neatly into either the 'content-based' or the 'content-neutral' category. To be sure, the ordinance treats theatres that specialize in adult films differently from other kinds of theatres." 475 U.S. at 47, 106 S.Ct. at 929. The Supreme Court upheld the constitutionality of the *Renton* ordinance even though it distinguished between various types of theatres based specifically on the content of the films which they offered. In this regard, the Hastings Zoning Ordinance varies significantly from the ordinance at issue in *Renton.* First, the Hastings ordinance

does not distinguish between churches, it treats all churches similarly. Second, and perhaps more important with respect to the Church's claims under the free exercise clause, the Hastings ordinance does not single out churches as opposed to various other establishments or activities. Although it is true that churches are specifically mentioned as permitted uses within residential zones, they are not specifically excluded from the commercial or industrial zones. Indeed, the ordinance is arranged in such a way that only the permitted uses are specifically mentioned, exclusions are indicated by certain uses not being specifically identified in the permitted uses section. This drafting arrangement is important with respect to the Church's claims because if the Church's free speech challenges are given credence, then a host of other free speech challenges, even though lacking a religious base, would have to be viewed as valid first amendment attacks. The effect of affording all such challenges a legitimate constitutional basis would be to destroy the City's ability to place content-neutral time, place, or manner regulations on any speech anywhere within the City.

Such a pervasive restriction would violate the City's right to regulate speech. Such a perverse result would conflict with controlling free speech precedent. Consequently, the court concludes that the Hastings Zoning Ordinance is content-neutral.

■ The second requirement which the Hastings ordinance must satisfy is that it be narrowly tailored to serve a significant governmental interest. Determining whether the City has satisfied this requirement requires a two-part analysis. First, the court must determine whether the zoning ordinance serves a governmental interest. The answer to this inquiry is clear. There is little question that municipalities have a significant interest in establishing content-neutral zones in which certain establishments may locate and specified activities may take place. *See, e.g., Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310, *reh'g denied,* 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976). It is also manifestly clear that a permissible manner in which to attain this substantial governmental interest is through the promulgation of zoning ordinances. *See, e.g., Renton v. Playtime Theaters, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Heffron v. International Society for Kirshna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). Accordingly, the court finds that the Hastings Zoning Ordinance serves a significant governmental interest.

The only remaining question is whether the ordinance is narrowly tailored to serve the significant interest at which it is aimed. The Supreme Court recently shed light on what is required to satisfy this standard. In examining the New York sound ordinance at issue in *Ward,* the Court concluded:

> The Court of Appeals erred in sifting through all the available or imaginable alternative means of regulating sound volume in order to determine whether the city's solution was "the least intrusive means" of achieving the desired end. This "less-restrictive-alternative analysis ... has never been a part of the inquiry into the validity of time, place, and manner regulation." Instead, our cases quite clearly hold that restrictions on the time, place, or manner of protected speech are not invalid "simply because there is some imaginable alternative that might be less burdensome on speech."
>
> ....
>
> Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate content-neutral interest but that it need not be the least-restrictive or least-intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."

*Ward,* 109 S.Ct. at 2757–2758 (citations omitted). It is clear in this case that the Hastings Zoning Ordinance promotes a

substantial governmental interest that would be achieved less effectively absent the regulation. Consequently, the zoning ordinance is narrowly tailored to serve a significant government interest.

Finally, the court must determine whether the Hastings Zoning Ordinance leaves open ample alternative channels of communication. This part of the time, place, or manner regulation standard is least troublesome for the court. The Hastings Zoning Ordinance specifically permits land located in residential areas to be used for churches. The land located within the City's residential areas constitutes a full 45 percent of the area within the City.

In *Renton*, the Supreme Court noted that that City's ordinance left "more than five percent of the entire land area of Renton open to use as adult theatre sites." 475 U.S. at 53, 106 S.Ct. at 932. The Court concluded that the ordinance at issue provided for ample and accessible land on which the respondents could locate their business and thus held that the ordinance did not violate the Constitution. Similarly, in this case the undisputed fact that 45 percent of the entire area of the City is zoned for residential, and thus church use, allows the Hastings Zoning Ordinance to pass constitutional muster.

The court also notes the Church's argument that, because the Church has been unable to find a satisfactory location for its Church in the residential zones, this land is, although technically available to the Church, truly unavailable as a practical matter. The Supreme Court addressed this very argument in *Renton:*

> Respondents argue, however, that some of the land in question is already occupied by existing businesses, that "practically none" of the undeveloped land is currently for sale or lease, and that in general there are no "commercially viable" adult theatre sites within the 520 acres left open by the Renton Ordinance. The Court of Appeals accepted these arguments, concluded that the 520 acres was not truly "available" land, and therefore held that the Renton ordinance

"would result in a substantial restriction" on speech.

> We disagree with both the reasoning and the conclusion of the Court of Appeals. That respondents must fend for themselves in the real estate market, on an equal footing with other perspective purchasers and lessees, does not give rise to a First Amendment violation.

475 U.S. at 53–54, 106 S.Ct. at 932 (citations and footnote omitted). Consequently, the court rules that the zoning ordinance leaves open ample alternative channels of communication.

Accordingly, the court finds that there is no genuine issue of material fact as to whether the Hastings Zoning Ordinance is justified without reference to the content of the regulated speech, is narrowly tailored to serve a significant government interest, and leaves open ample alternative channels of communication. Accordingly, the defendant is entitled to summary judgment on plaintiffs' free speech claim.

## B. *Freedom of Association*

■ Plaintiffs claim that the Hastings Zoning Ordinance violates their constitutionally guaranteed right to freedom of association. The right to freedom of association is somewhat amorphous:

> [T]he Supreme Court has examined at least three separate aspects of the right to associate or to refuse to associate....

> First, individuals might associate to achieve economic or other goals that are unconnected to any fundamental constitutional right.

> A second type of freedom to associate is protected by the concept of liberty and the due process clauses and as an implicit part of the Bill of Rights Guarantees; this right is connected to the fundamental right to privacy.

> Third, the Court has recognized a right to associate for the purpose of engaging in the types of activity expressly protected by the First Amendment.

3 R. Rotunda, J. Nowak, & J. Young, *Treatise on Constitutional Law Substance and Procedure,* § 20.41 (1986).

The Church's freedom of association claim falls under the third of the above categories. The Church believes that in limiting the locations in which it can hold its meetings and worship services the City has infringed on its freedom of association. In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the United States Supreme Court addressed the factual basis that is required to sustain a freedom of association claim. The Court noted that in other cases, such as *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the plaintiffs were able to sustain a freedom of association claim only after they had proven that members of the plaintiff organization had suffered some hardship as a result of the action which the organization was challenging. 424 U.S. at 69, 96 S.Ct. at 658. Indeed, in *NAACP v. Alabama*, the plaintiff organization had "made an uncontroverted showing that on past occasions revelations of the identity of its rank-and-file members [had] exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." 357 U.S. at 462, 78 S.Ct. at 1172. In discussing *NAACP v. Alabama*, the *Buckley* Court noted that no record of harassment on a similar scale was found in the case before it. The Court further held that any injury which the plaintiff might have suffered in *Buckley* was "highly speculative." 424 U.S. at 70, 96 S.Ct. at 659. As a result of the plaintiff's inability to prove some nonspeculative harm, the Court held that the plaintiff's freedom of association claim could not survive. *Id.* at 72, 96 S.Ct. at 660.

In this case, the court is faced with a situation similar to that in *Buckley*. The Church has failed to bring forward any information which would tend to indicate that the Church or its members have suffered some sort of harm, hardship or harassment as a result of the City enforcing the zoning ordinance. That there is little evidence to support the Church's freedom of association claim is borne out by the Church's sparse treatment of the issue in its memorandum and by the Church's total failure to address the freedom of association issue at oral argument. Plaintiffs have failed to come forward with any evidence which might tend to suggest that it or its members have suffered any sort of nonspeculative injury as a result of the zoning ordinance. Consequently, there is no genuine issue of material fact with respect to the Church's freedom of association claim and the defendant is entitled to summary judgment thereon.

## C. *Due Process*

■ The plaintiffs complain that the Hastings Zoning Ordinance, as applied to its attempt to locate its church in the commercial or industrial zones of Hastings, violates their right to due process guaranteed by the fourteenth amendment to the United States Constitution. The fourteenth amendment provides in pertinent part: "nor shall any state deprive any person of life, liberty, or property, without due process of law...." U.S. Const.Amend. XIV, § 1.

The Church contends that its rights under the due process clause are violated in two ways. First, the Church maintains that the city planner, Thomas Harmening, implements the zoning ordinance with unbridled discretion. Second, the Church argues that Harmening's decisions are not subject to any meaningful review. The court will address each of these contentions in turn.

The Church first challenges the zoning ordinance under the due process clause based on the language contained in the ordinance and the way in which that language allows the city planner to apply the ordinance. In essence, the Church contends that because certain key terms in the ordinance are "undefined" within the ordinance itself, the city planner is allowed to exercise unbridled discretion when applying the ordinance to any particular land use. Regarding the language of the ordinance, the Church asserts that the words "commercial establishment," "private clubs" and "churches" are not defined. Of particular concern to the Church is the definition of "private clubs" as that term is used in Sec. 10.17.C–3, Subd. 2.C of the

zoning ordinance. The Church avers that the term "private clubs" is so general as to allow the city planner to interpret the term as narrowly or expansively as he chooses. Moreover, the Church suggests that because the definition of this term is not fixed, the city planner may change the definition at will depending on the nature of the entity to which he is applying the ordinance and his personal disposition with respect to that entity.

In two recent United States Supreme Court cases city ordinances were challenged as violative of due process on the grounds that they vested an administrative official with unbridled discretion. First, in *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), the Court invalidated a city ordinance which regulated the issuance of permits allowing the placement of newsracks on public property. The ordinance and the due process reasoning is best described by the Court:

> § 901.181, codified ordinances, City of Lakewood provides: "the mayor should either deny the application [for a permit], stating the reasons for such denial or grant said permit subject to the following terms...."
>
> § 901.181[c] sets out some of those terms, including: "[7] such other terms and conditions deemed necessary and reasonable by the mayor." It is apparent that the face of the ordinance itself contains no explicit limits on the mayor's discretion. Indeed, nothing in the law as written requires the mayor to do more than make the statement "it is not in the public's interest" when denying a permit application. Similarly, the mayor could grant the application, but require the newsrack to be placed in an inaccessible location without providing any explanation whatever.

*Id.* 108 S.Ct. at 2150. Not surprisingly, the Court invalidated the Lakewood ordinance as violative of due process because it entrusted the mayor with an extraordinary amount of discretion. The ordinance required the mayor to provide the reasons why he had arrived at his conclusions, but did not provide any standards by which he was to arrive at his conclusions or with which his conclusions had to comply.

In a case already discussed at length above, *Ward v. Rock against Racism*, — U.S. —, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), the Court examined a New York City noise control ordinance which was enacted to control the volume of amplified music emanating from a Central Park Bandshell. In addition to challenging this ordinance on free speech grounds, the plaintiffs claimed that the ordinance was invalid because it placed unbridled discretion in the hands of city officials charged with enforcing it. *Id.* 109 S.Ct. at 2755. In rejecting the plaintiffs' due process challenge, the Court stated:

> The city's guideline states that its goals are to "provide the best sound for all events" and to "insure appropriate sound quality balanced with respect to nearby residential neighbors in the mayorally decreed quiet zone of [the] Sheep Meadow." While these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.... By its own terms the City's sound-amplification guideline must be interpreted to forbid City officials purposely to select inadequate sound systems or to vary the sound quality or volume based on the message being delivered by performers.

*Id.* at 2755–56. In *Ward*, the Court recognized that evaluating ordinances under the due process clause is not a scientifically precise task. Rather, the Court accepted the notion that while a law may leave room for the exercise for some discretion on the part of a city official, this exercise of discretion may not be so grievous as to violate the Constitution. In effect, the Court suggests that due process analysis is a matter of degree. The Supreme Court's holding in *Ward* is consistent with its earlier proclamation that "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92

S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972). "It will always be true that the fertile legal 'imagination' can conjure up hypothetical cases in which the meaning of [disputed] terms will be a nice question." *Id.* n. 15 (citing *American Communications Assn. v. Douds*, 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950)).

When faced with the task of interpreting any statute or ordinance, it is axiomatic that a court is bound to give the words used in the ordinance their common meaning. The Church complains that the term "private clubs" is undefined within the ordinance and as such is open to wildly inconsistent interpretation by the city planner. In support of this contention, the Church points out that although a Masonic Lodge, an American Legion Hall, a VFW Post, an Alcoholics Anonymous Chapter and Birthright (a crisis pregnancy center) are allowed to locate within the C–3 commercial downtown area, the Church is not allowed to so locate. The Church argues that allowing these various organizations, some of which have distinct spiritual elements, to locate in the downtown area while banning the Church is a consequence fostered by the vague use of language in the zoning ordinance. At its heart, this argument suggests that the city planner is allowed to apply his own discretionary definition of the term "private clubs" without any reference to objective criteria.

What the Church's argument fails to account for is that the Hastings ordinance, just like the ordinance at issue in *Ward*, must be interpreted and applied so as to maintain some semblance of internal consistency. This means that the Church's argument will only be successful if it is an accurate representation of what the ordinance "allows" when examined against the backdrop of the ordinance as a whole. In short, the plaintiffs may mount a successful constitutional attack against the ordinance on the grounds of vagueness only if the specific terms which they attack, when measured against the statute as a whole, are so vague as to grant the city planner unbridled discretion. When examined in this light, the Church's argument loses its force.

First, the Church's argument that it should be classified as a "private club" seems convincing until one realizes that under the statute a church is referred to as a "church." In the residential provisions of the zoning ordinance quoted above "churches" are specified as a permitted use. Masonic Lodges, American Legion Halls, VFW Posts, Alcoholics Anonymous Chapters and crisis pregnancy centers are not specifically listed as permitted uses under any provision of the ordinance. To suggest that a church is both a "church" and "private club" does violence to the plain meaning of the ordinance. It might well be argued that the Church's attempt to include itself within the definition of "private clubs" makes no more sense than any of the private clubs listed above attempting to classify themselves as "churches."

Second, there is no question that the Church is included within the definition of "churches" as that term is used in the ordinance. The Church has incorporated itself as a "church" under the laws of the state of Minnesota. The Church has identified the proposed use of various property within Hastings as "a church." Moreover, and perhaps most obviously, the Church's very name, "The Cornerstone Bible Church," places it in a most awkward position to deny that it is a "church" or, by the same token, to assert that it is something other than a church, for example, a private club.

The Church argues that the zoning ordinance places unbridled discretion in the hands of the city planner because it fails to adequately define the terms "private clubs" and "commercial establishments." A cursory analysis of this argument reveals its flaws. The Church would require that the term "commercial establishment" be defined more precisely within the ordinance. If the provision of the ordinance in which that term is used (§ 10.17.3–3), is examined however, it will be discovered that, in an attempt to describe what constitutes a "commercial establishment," the ordinance lists seven categories of establishments containing no fewer than 30 exam-

ples of what constitutes a commercial establishment. Although the court recognizes that there are various methods in which to define a term, if providing 30 specific examples within seven categories of "establishments" does not adequately define a term, the court is not sure what type of definition would quiet the plaintiff's argument. The Church would seem to also require the ordinance to define each category of establishment and each example within that category and thus send the ordinance whirling into an infinite regress of self-definition and clarification.

Although it is true that the term "private clubs" is not followed by any definition or series of examples, it is clear that a "church" is not subsumed under this definition. It is an accepted principle that a definition is comprised of two parts: what a thing is and what it is not. Sometimes reference to only one part of a definition is dispositive of a linguistic dispute. Such is the case here. Whatever the plaintiffs might argue a private club is, it most definitely cannot include what it is not. With respect to language as used within the zoning ordinance and interpreted with common sense, a private club does not include a church. Indeed, one might argue that to attempt to classify a church as a mere private club is an affront to the unique nature of churches and the special mission for which they are established. It seems appropriate, given the noble foundation and aspirations of institutions such as the Cornerstone Bible Church, that a special classification is reserved exclusively for them. The Hastings Zoning Ordinance reserves such a category for churches.

Based on the foregoing, the court concludes that the zoning ordinance does not grant the city planner unbridled discretion and thus that plaintiffs' first due process argument must be rejected.

■ The Church's second due process argument is that the zoning ordinance is unconstitutional because the city planner's decisions are not subject to any meaningful review. Reference to the undisputed facts of this case is dispositive of this claim.

The parties do not dispute that the city planner's decisions made pursuant to the zoning ordinance are subject to two possible forms of review. First, and most directly responsive to the Church's contention, the city planner's decisions are subject to review by direct appeal to the Board of Zoning Appeals. This is essentially an appeal to the city council which acts as the Board of Zoning Appeals in cases challenging the city planner's decisions under the zoning ordinance. It is undisputed that in the present case the board has granted a number of extensions to the Church allowing it to continue its non-compliance with the zoning ordinance and the city planner's order to immediately cease the occupancy of the Caturia Building. In addition to the present case, since 1987 the board has overruled or altered in some respect the city planner's decisions on at least three occasions.[2]

In addition to the direct review of the city planner's decisions afforded by the Board of Zoning Appeals, zoning decisions may be attacked via the "legislative route." In effect, this is an appeal to the city government to have a particular area in the City rezoned or a particular non-conforming use allowed. It should be noted that the plaintiffs have pursued this course with respect to various properties which they have wanted to use for a Church but which are not zoned for such use.

■ These two forms of review are truly "meaningful" and provide disgruntled land-use applicants with the requisite due process protections. *Compare, e.g., Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988).

In the final analysis, both of the Church's due process arguments are unpersuasive. When the city planner is faced with a request that certain land be used as a church, he need do only two things. First, the planner must determine whether the proposed use is a "church" under the ordinance—a determination in which the very terms of the ordinance itself limit his

---

**2.** *See* Affidavit of Thomas K. Harmening, at 2–3.

discretion severely. Second, the planner need simply consult the ordinance and zoning map to determine whether a "church" is a permitted use on the applicant's land. If the applicant disagrees with the planner's determination, the applicant can appeal the decision to the Board of Zoning Appeals or request the City to rezone the area or create a specific exception for the specified property. In light of the undisputed facts and controlling Supreme Court precedent, the court concludes that there is no genuine issue of material fact with respect to the plaintiffs' due process claims and that defendant is entitled to summary judgment thereon.

### D. *Equal Protection*

■ Plaintiffs next argue that the Hastings Zoning Ordinance violates its rights to equal protection. The fourteenth amendment to the United States Constitution provides in pertinent part: "Nor [shall any state] deny to any person within its jurisdiction the Equal Protection of the laws." U.S. Const.Amend. XVI, § 1. Plaintiffs base their equal protection claim on two grounds. First, plaintiffs claim that they are treated differently than other similarly situated entities. Second, plaintiffs maintain that they are treated differently because of their religious beliefs and that this religious-based treatment subjects the zoning ordinance to strict scrutiny. The court will address these contentions in order.

The first issue the court must consider is whether the Church is treated differently than other similarly situated entities. Plaintiffs complain that they are not allowed to locate their church in a C–3 zone while other non-commercial entities such as Alcoholics Anonymous, the Masonic Lodge and the Birthright Crisis Center are allowed to locate there. As the plaintiffs correctly suggest, the equal protection clause is "essentially a direction that all persons similarly situated should be treated alike." Plaintiffs' Memorandum Opposing Defendant's Motion for Summary Judgment at 28 (citing *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d

313 (1985)). The initial determination which must be made is whether the Church is similarly situated to entities such as Alcoholics Anonymous, the Masonic Lodge and the Birthright Crisis Center.

In support of their argument that the Church is similarly situated to various other "non-commercial" entities which have been allowed to locate in the C–3 zone, plaintiffs rely on the "quasi-religious aspects" of Alcoholics Anonymous and the Masonic Lodge. *See* Plaintiffs' Memorandum Opposing Defendant's Motion for Summary Judgment at 28. The City responds to this argument by invoking various definitions of "clubs," the most far-reaching of which attempts to define a club as an entity which may apply for a liquor license in the state of Minnesota. Both the Church's and the City's arguments go beyond what is necessary to decide this issue. As was discussed in the due process section above, the terms used in the ordinance, when informed by common sense, clearly distinguish between "churches" and "private clubs." The Church argues that because Alcoholics Anonymous and the Masonic Lodge have certain spiritual aspects they are similarly situated to the Church. What the Church cannot deny, however, is that the Church describes itself precisely as a "church" while Alcoholics Anonymous and the Masonic Lodge cannot be so defined. *See* Affidavit of Willard Dotson, at 1; Affidavit of Ray Schlemmer, at 2. The Church is similar to these other entities in some respects. These similarities, however, are not significant for purposes of the ordinance or the equal protection clause. Thus, under the specific terms of the ordinance, the Church is not similarly situated to Alcoholics Anonymous, the Masonic Lodge or any of the other non-commercial entities located in the C–3 zone.

■ The second ground for plaintiff's equal protection claim is that the Church is treated differently precisely because of its religious affiliation. The Church contends that this is a constitutionally impermissible classification and, as such, subjects the Hastings Zoning Ordi-

nance to strict scrutiny analysis.[3] In *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), the United States Supreme Court stated that:

Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest.

*Id.* at 303, 96 S.Ct. at 2516–17; *see also Love Church v. City of Evanston,* 671 F.Supp. 515, 517 (N.D.Ill.1987). Plaintiffs claim that the zoning ordinance is subject to strict scrutiny because it establishes a classification which is drawn upon the inherently suspect distinction of religion. If the zoning ordinance did establish a classification based solely on religion, the plaintiffs would be correct. As discussed above in the content-neutrality section of the first amendment discussion, however, the classifications in the ordinance are not based on the religious character of "churches" or motivated by an anti-religious intent. This conclusion is supported by the fact that it is not only Churches which are excluded from the C–3 zone. Numerous other entities are excluded from the commercial zone and many of the entities which are specifically allowed to locate in commercial zones are excluded from industrial zones. The court determines that the Hastings Zoning Ordinance does not establish suspect classifications and thus is not subject to strict scrutiny analysis. As such, the zoning ordinance need be only rationally related to a legitimate governmental interest. *See* 427 U.S. at 303, 96 S.Ct. at 2516. As discussed in the free speech section above, the ordinance is narrowly tailored to achieve a legitimate governmental interest, hence the court now holds that it is rationally related to that legitimate governmental interest.

Based on the foregoing, the court concludes that there is no genuine issue of material fact with respect to plaintiffs' equal protection claim and that defendant is entitled to summary judgment on that claim.

E. *Free Exercise*

■■■ Finally, plaintiffs challenge the Hastings Zoning Ordinance on the grounds that it violates their rights to free exercise of religion under the first amendment of the United States Constitution. The free exercise clause provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const.Amend. I. The United States Supreme Court recently addressed the applicability of the free exercise clause to state regulations in *Employment Division, Department of Human Resources of Oregon v. Smith,* — U.S. ——, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

In *Smith,* the Court addressed the constitutionality of an Oregon state statute which prohibited the use of peyote. The issue was whether the state prohibition of peyote use was constitutional as applied to religious sacramental use of peyote by Native Americans. In holding that the complete ban on peyote use did not violate the Native Americans' free exercise rights, the Court stated "[w]e have never held that an individual's religious beliefs excused him from compliance from an otherwise valid law prohibiting conduct that the state is free to regulate." *Id.* 110 S.Ct. at 1600. As the plaintiffs correctly state, "[i]n *Smith,* the Supreme Court ruled that neutral laws of general applicability can no longer be [successfully] challenged under the free exercise clause alone." Plaintiff's Memorandum Opposing Defendant's Motion for Summary Judgment at 18.

*Smith* has not totally foreclosed free exercise challenges, however. There are still

---

**3.** Strict scrutiny is the most exacting analysis to which the ordinance can be subjected under the equal protection clause. Under strict scrutiny analysis a classification will be upheld only if it is necessary to promote a compelling state interest. Strict scrutiny is reserved for cases involv-

ing laws that operate to the disadvantage of suspect classes or interfere with the exercise of fundamental constitutional rights and liberties. *See San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

two types of situations which will be strictly scrutinized under the free exercise clause. First, laws which directly regulate religious beliefs or religious-based conduct will be strictly scrutinized. Second, "hybrid situations" in which laws violate the free exercise clause and some other constitutional right such as freedom of speech or freedom of the press will receive strict scrutiny. Plaintiffs claim that both of these situations correctly describe the City's treatment of the Church. The court will address each of the situations as it applies to the present dispute.

▪ First, the Church argues that the zoning ordinance directly regulates religious worship and as such is subject to the compelling state interest/least restrictive means test. In *Smith,* the Supreme Court stated:

> It would be true, we think (though no case of ours has involved the point), that a state would be "prohibiting the free exercise [of religion]" if it sought to ban such acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display. It would doubtless be unconstitutional, for example, to ban the casting of "statues that are to be used for worship purposes," or to prohibit bowing down before a golden calf.

*Id.* at 1599. The key here is that something must be prohibited precisely because of its religious affiliation or its display of religious belief. As applied to the instant litigation, it means that the City must prohibit churches from locating in the C–3 zone specifically because of their religious character. In the context of the free exercise clause, this is the only motivation which will subject the zoning ordinance to strict scrutiny analysis. As discussed at length above, however, the zoning ordinance neither excludes only churches from the commercial and industrial zones nor reveals an anti-religious intent. Consequently, the court concludes that the first ground for plaintiffs' free exercise challenge must fail.

▪ Second, the plaintiffs claim that the zoning ordinance violates their rights under the free exercise clause because the present case presents a "hybrid situation." In *Smith* the Court stated:

> the only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the free exercise clause alone, but the free exercise clause in conjunction with other constitutional protections, such as freedom of speech and of the press.

*Id.* at 1601. In essence, the Church claims that the ordinance should be strictly scrutinized because it violates the Church's right to free exercise of religion as well as the Church's rights to free speech, equal protection, and due process. In light of the Court's conclusions in Sections A, C and D above that the ordinance does not violate the Church's rights to free exercise, due process or equal protection, this claim is easily disposed of. Because plaintiffs have failed to establish a violation of another constitutional right, their free exercise claim alone is not sufficient to establish a cause of action. Consequently, the plaintiffs' second ground for its free exercise claim cannot carry the day.

In accordance with the foregoing, the court concludes that there is no genuine issue of material fact with respect to plaintiffs' free exercise claim and that defendant is entitled to summary judgment thereon.

## CONCLUSION

Based on the foregoing, the court concludes that defendant is entitled to summary judgment on all of plaintiffs' claims. Accordingly, IT IS HEREBY ORDERED that:

1. Defendant's motion for summary judgment on plaintiffs' free speech claim is granted;

2. Defendant's motion for summary judgment on plaintiffs' freedom of association claim is granted;

3. Defendant's motion for summary judgment on plaintiffs' due process claim is granted;

4. Defendant's motion for summary judgment on plaintiffs' equal protection claim is granted;

5. Defendant's motion for summary judgment on plaintiffs' free exercise claim is granted.