**CORNERSTONE BIBLE CHURCH, James Bzoskie, Appellants,**

v.

**CITY OF HASTINGS, Appellee.**

**No. 90–5347.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1991.

Decided Nov. 1, 1991.

Before LAY, Chief Judge, McMILLIAN and ARNOLD, Circuit Judges.

LAY, Chief Judge.

Cornerstone Bible Church (Church) and its pastor, James Bzoskie, appeal the district court's grant of summary judgment in favor of the City of Hastings, Minnesota. The suit arose from enforcement of a zoning ordinance restricting the location of the Church from the town's central business district. Upon review we affirm in part, reverse in part, and remand for trial.

## I.

The City of Hastings (City) is the second oldest city in the State of Minnesota. Established along the Mississippi River in 1853, the City's business district developed parallel to the river. Although the City has expanded and now covers more than ten square miles, the riverside business district has been preserved and is a significant business area.

In the mid–1970s the City set out to revitalize its central business district. It developed a Downtown Revitalization Plan designed to preserve and restore the central business district. The goals of the Revitalization Plan are promoted by the City Planning Commission and are enforced under the City's zoning ordinance.

The City zoned its central business district commercial (C–3) with the intent of establishing "a community-regional commerce district ... in recognition of the existing downtown commercial development and of the need for its future expansions, rehabilitation and redevelopment." Hastings, Minn., Zoning Ordinance § 10.17 subd. 1. Permitted land uses in the C–3 zone include commercial establishments, public and semi-public buildings, private clubs, second-floor apartments, parking lots and "[a]ccessory uses incidental to the foregoing principal uses." *Id.* at subd. 2. Uses allowed under special permit include gas stations, drive-in establishments, creameries and small animal clinics. Section 10.17 does not mention churches.[1]

Jordan Lorence, Washington, D.C., argued (Cimron Campbell, Mark N. Troobnick and Jane E. Hadro, Washington, D.C., and Wendell R. Bird, Atlanta, Ga., on brief), for appellants.

Barbara J. Hoekstra, Hastings, Minn., argued (James M. Hamilton and George L. May, Hastings, Minn., on brief), for appellee.

1. The relevant part of the zoning ordinance reads as follows:

Section 10.17. C–3 COMMUNITY–REGIONAL COMMERCE

The Cornerstone Bible Church was organized in Hastings in 1983. The Church first met in Pastor James Bzoskie's home. The congregation quickly outgrew that location and the Church rented space in the local high school. Seeking a permanent home, the Church first purchased property on 10th Street in an industrial zone, making the purchase contingent on City approval of a change in zoning to residential use, which would encompass churches. The City denied the zoning change but the Church went ahead with the purchase.

During this time the Church leased the Caturia Building in the central business district and began conducting church activities there. The City notified the Church that it must discontinue using the Caturia Building for church activities. The Church responded by negotiating to purchase a theatre in the central business district. The Church requested the City to amend the zoning ordinance to allow church activities at the theatre. The City denied the request but gave the Church an extension of time to vacate the Caturia Building.

The Church then proposed yet another location, at 515 East 3rd Street in an area zoned for industrial use. The City gave preliminary approval to a change in zoning for the site but the Church withdrew its request and requested rezoning of its 10th Street property. The City denied the request and continued to press the Church to leave the Caturia Building. The Church then filed this lawsuit.

Although the Church has requested zoning variances or amendments with respect to both industrial and commercial zones, this lawsuit focuses on the City's exclusion of churches from the central business district (C–3) zone. The City Council resolution denying the Church's request to use the Caturia Building expresses the City's rationale for precluding churches from the central business district:

> The nature and timing of general church activities is in contrast to the business environment and to the business hours of the downtown. Therefore, no business or retail contribution or activity is generated which is contrary to the intent of the C–3 zone and the goals and objectives of the Downtown Redevelopment Plan and the Hastings Comprehensive Plan.

Hastings City Council Resolution No. 4–87 (Jan. 5, 1987). The City Council also found no need to provide space for churches in the central business district because churches are allowed in the residential zones that comprise forty-five percent of the City. *Id.*

The Church challenged the City's policy of excluding churches from the central business district as violative of its rights to free speech, freedom of association, free exercise of religion, equal protection and

SUBD. 1. Intent. The intent of this Chapter in establishing a community-regional commerce district is in recognition of the existing downtown commercial development and of the need for its future expansions, rehabilitation and redevelopment.

SUBD. 2. Uses Permitted

A. Commercial establishments including, but not limited to, the following:

(1) Retail establishments such as grocery, hardware, drug, clothing and furniture stores, eating and drinking places, and franchised auto dealers.

(2) Personal services such as laundry, barber, shoe repair shop and photography studio.

(3) Offices: Administrative, executive, professional, medical and research, without merchandising services.

(4) Finance, insurance and real estate services.

(5) Repair services such as jewelry and radio and television repair shops, but not auto repair.

(6) Entertainment and amusement services, such as motion picture theatre and bowling alley.

(7) Lodging services such as hotel and motel.

B. Public and semi-public buildings such as post office, fire station and City Hall.

C. Private Clubs.

D. Apartments provided they are located above the first floor level.

E. Automobile parking lots.

F. Accessory uses incidental to the foregoing principal uses such as off-street parking and loading areas, signs, storage of merchandise, and wholesaling, when incidental to a permitted use.

SUBD. 3. Uses by Special Permit

A. Automobile service stations and motor vehicle repair and wash.

B. Drive-in establishments.

C. Creameries.

D. Small animal clinics, excluding establishments with outside runs and non-patient overnight boarding.

due process. The district court granted summary judgment for the City on all claims.

## II.

### A. FREE SPEECH

The Church argues that the City's exclusion of churches from the central business district violates the congregation's rights to free speech. Because the City does not preclude churches entirely, the district court held that the zoning ordinance is properly analyzed as a time, place, and manner restriction. *City of Renton v. Playtime Theatres Inc.*, 475 U.S. 41, 46, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986). The court then held that the City's policy was a valid time, place, and manner restriction under the test set out in *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

■ The City allows churches, and by implication organized religious speech, in residential areas but not in the central business district.[2] Although the City's stated objective is to allow uses that generate economic activity, the City has chosen to place determinative weight on the fact that the proposed use is a church. Thus, the religious content of the applicant's speech can determine whether the City permits it to locate in the C–3 zone.[3]

■ The Supreme Court's decisions in *Renton* and *Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988), how-ever, make clear that a restriction of speech should be analyzed as content-based only if the asserted justification for the restriction is content-based. *Renton*, 475 U.S. at 48, 106 S.Ct. at 929; *Boos*, 485 U.S. at 320–21, 108 S.Ct. at 1163–64. "Government regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'" *Ward*, 491 U.S. at 791, 109 S.Ct. at 2753–54 (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)). In *Renton*, the zoning ordinance restricted the location of adult theatres—a content-based restriction—but the City justified its ordinance by asserting that it was concerned only with the secondary effects adult theatres have on the surrounding neighborhood. 475 U.S. at 47, 106 S.Ct. at 928–29. The Court analyzed the Renton ordinance as a time, place, and manner restriction. *Id.* at 46, 106 S.Ct. at 928.

The City does not attempt to justify its ordinance as a valid effort to circumscribe religious worship. The City claims to be interested only in the secondary effects of the Church on economic vitality in the central business district. Although the Church disputes whether economic vitality is the real objective of the ordinance, the City's assertion of a content-neutral justification is sufficient to render the ordinance subject to time, place, and manner analysis. *Id.*[4]

---

**2.** Although exclusion of churches from the central business district is not explicit in the text of the ordinance, the City has unequivocally interpreted the ordinance to exclude churches from the C–3 zone. The district court places much emphasis on the fact that the zoning ordinance does not explicitly exclude churches from the central business district. 740 F.Supp. 654, 662. We cannot embrace such a distinction. All parties agree that the City enforces its ordinance to exclude churches from the C–3 zone. Thus, it is inconsequential whether that exclusion is explicit or implicit in the ordinance. To hold otherwise would allow governments to evade first amendment scrutiny simply by drafting their laws to restrict speech implicitly rather than explicitly.

**3.** This view of the City's ordinance gains support from the fact that the City has permitted several non-commercial entities to locate in the C–3 zone, including the Masonic Lodge, Alcoholics Anonymous, and Birthright (a pregnancy counseling center). These organizations do not appear to further the City's goal of economic vitality any more than the Church, yet only the Church has been excluded.

**4.** *See also* L. Tribe, *American Constitutional Law* § 12–3, at 795 n. 4 (2d ed. 1988) (" '[W]hat sort of regulation it really is' is irrelevant, as well as unintelligible. The critical inquiry is whether the state chooses to (or must) *justify* the regulation by reference to dangers that flow from an act's communicative content." (citation omitted)). Practically speaking, it is too difficult to ascertain the City's true purpose if in fact its asserted justification is a pretext. *United States v. O'Brien*, 391 U.S. 367, 383–84, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1968).

■ In the present case, the C–3 zoning requirements exclude churches altogether. Thus, we express a lingering doubt as to whether the time, place and manner doctrine applies. However, we construe the overall Hastings zoning ordinance, which makes allowances for churches in residential areas, as simply restrictive and therefore find the time, place, and manner rule applicable. In *Renton*, adult theatres were not banned altogether but were not allowed "within 1000 feet of any residential zone, single– or multiple-family dwelling, church, park, or school." *Id.* at 43, 106 S.Ct. 926–27. It was on this basis the Court applied the time, place and manner regulation.

*Time, Place and Manner.*

■ A valid time, place, and manner restriction must (1) be narrowly tailored to serve a significant governmental interest, and (2) leave open ample alternative channels for communication of the information. *Ward*, 491 U.S. at 791, 109 S.Ct. at 2753–54. As the district court observed, zoning in general is a legitimate municipal tool and the City's revitalization plan is unquestionably a permissible municipal objective. *See Renton*, 475 U.S. at 50, 106 S.Ct. at 930. However, the question whether the ordinance is narrowly tailored requires more particularized scrutiny.

■ Although the City is not required to show that its ordinance is the least-restrictive means of accomplishing its objective, *Ward*, 491 U.S. at 798, 109 S.Ct. at 2757, the City "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 799, 109 S.Ct. at 2758; *see also Renton*, 475 U.S. at 51–52, 106 S.Ct. at 931 ("[W]hatever evidence the city relies upon [must be] reasonably believed to be relevant to the problem that the city addresses."). This places the bur-

den on the City to provide some factual support for its claim that exclusion of churches advances its goal of revitalizing the central business district.

■ The City presented affidavits from two city planners containing little more than conclusory statements that excluding churches from the C–3 zone is consistent with the City's planning process and historical land-use. *Church App.* at 128–35. The only specific reasons given for excluding churches were that a church would displace potential commercial uses and increase the potential for traffic, parking and land-use conflicts.[5] *Id.* at 133–34. The Church argues that both affidavits should be discounted because the affiants had been on the City payroll and had helped develop the planning policies they were defending.

Significantly, the City conceded that it had never conducted any studies of the effects of churches on commercial activity, even though several existing churches border the C–3 zone. Although the City Council resolution stated that "[t]he nature and timing of general church activities is in contrast to the ... business hours of the downtown," Hastings City Council Resolution No. 4–87 (Jan. 5, 1987), the City has not · supported this statement. Indeed, some of the permitted uses have much the same hours of operation as the Church.[6] Moreover, the Church met the City's evidence with affidavits from owners of businesses in the C–3 zone who stated that Cornerstone Bible Church had no negative effects on the central business district. *Church App.* at 54, 59.

In a summary judgment proceeding the court is to view the facts in the light most favorable to the non-moving party. *McCuen v. Polk County*, 893 F.2d 172, 173 (8th Cir.1990). The City's affidavits are conclusory and speculative, pointing only to

---

5. The City concedes that the traffic-related issues are asserted only "in passing" and are "not ... the keystone of the City's position in this matter." *City Brief* at 26.

6. The record indicates that the Church has services on Sunday mornings and evenings, Wednesday evenings, and has bible college on

Tuesday evenings. *Church App.* at 44–45. It is not clear when counseling services and other activities take place. *See id.* The Veterans of Foreign Wars and the American Legion are open evenings and Sundays. *City App.* at 129; *Church App.* at 123.

potential secondary effects without the benefit of any study or factual support. Although the Court in *Renton* held that a city need not conduct new studies if it was relying on relevant studies generated by other cities, it did not eliminate the City's obligation to provide some type of factual support for its allegation of secondary effects. 475 U.S. at 51, 106 S.Ct. at 931. The City has not provided factual support for the assumptions that underlie its exclusion of churches, and the alleged secondary effects of churches on commercial activity remain a disputed factual issue. Thus, we find summary judgment was inappropriate.

*Underinclusive Classification*

■ The Church claims the ordinance is underinclusive because it excludes non-commercial religious entities but allows other non-commercial entities in the C–3 zone under the provision allowing "private clubs."[7] These permitted organizations, including Alcoholics Anonymous, Birthright (a pregnancy counseling center), the American Legion, the Veterans of Foreign Wars and the Masonic Lodge, conceivably displace potential commercial uses just as the Church would, yet the City permits the former in the C–3 zone.

Although the Court "frequently has upheld underinclusive classifications on the sound theory that a legislature may deal with one part of a problem without addressing all of it, ... [t]his presumption of statutory validity ... has less force when a classification turns on the subject matter of expression." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 215, 95 S.Ct. 2268, 2275–76, 45 L.Ed.2d 125 (1975). In *Erznoz-*

*nik*, the Court invalidated on first amendment grounds an ordinance prohibiting display of films containing nudity at drive-in theatres. The city justified its ordinance as an effort to avoid traffic accidents caused by distracted drivers on streets near the drive-in. *Id.* at 214, 95 S.Ct. at 2275. The Court found this justification insufficient in light of the wide variety of other scenes in movies that also would distract drivers.[8] *Id.* at 214–15, 95 S.Ct. at 2275–76.

On the issue of underinclusiveness there are disputed issues of material fact. The Church and City dispute whether the Church's activities are distinguishable in any relevant respect from permitted non-commercial uses. Although the district court discussed this issue to some degree in evaluating the Church's equal protection claim, 740 F.Supp. at 668, the focus of that analysis was somewhat misplaced. It is not necessary for us to debate the definitions of "church" or "private club," nor need we ascertain whether the permitted non-commercial uses are in any way "religious." Rather, the ordinance must be evaluated solely in light of its purposes.

Because the stated objective of the ordinance is to promote economic vitality in the C–3 zone, the ordinance must be upheld or invalidated based on whether the Church's land-use would impede the City's objective of economic vitality more or less than the permitted uses. The district court did not make any findings concerning the secondary effects of the permitted uses and the Church. However, the Church has established that non-commercial entities currently exist in the C–3 zone.[9] On remand the

7. See *supra* note 1. The district court found the City's failure to define the term "private clubs" irrelevant because it was clear that churches were "not subsumed in that definition." 740 F.Supp. 654, 667 (D.Minn.1990).

8. The Court also considered an underinclusiveness argument in *Renton*, 475 U.S. at 52, 106 S.Ct. at 931. The adult theatre owner argued that the Renton ordinance restricting the location of adult theatres was underinclusive because it did not regulate other types of adult business that would generate the same unwanted secondary effects. *Id.* The Court rejected the challenge because the theatre could not point to any other adult business in Renton that

was treated differently than the adult theatres. *Id.* at 52–53, 106 S.Ct. at 931–32. In contrast, the Church has identified five non-commercial entities permitted in the C–3 zone.

9. For that matter, it is difficult to imagine how a church would displace commercial activity any more than a second-story apartment, which is permitted in the C–3 zone. A church provides services to members and sometimes may engage in merchandising or quasi-commercial activity. It seems unlikely that any comparable activity would be generated from residences. Although allowing residents in the downtown area may generate demand, parishioners on their way to and from church for meetings, activities, coun-

factfinder should make such findings as will enable it to determine whether exclusion of churches from the C–3 zone is justifiable on the ground that a church displaces economic activity to a greater extent than the non-commercial uses the City has allowed in the zone.

## B. EQUAL PROTECTION

The equal protection clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). The Church's equal protection argument to some degree tracks its free speech claim. It argues that the City excludes the non-commercial Church from the C–3 zone but permits other similarly situated non-commercial entities. The district court found the Church not similarly situated to the permitted entities and concluded that any similarities "are not significant for purposes of the ordinance or the equal protection clause." 740 F.Supp. at 668.

Under the equal protection clause we must consider whether the City has a rational basis to differentiate between the Church and the entities it permits in the C–3 zone. Any differentiation must be relevant to the objectives the City is attempting to achieve through its ordinance. *Cleburne*, 473 U.S. at 441, 105 S.Ct. at 3255. In *Cleburne*, the Court enjoined a city's enforcement of a zoning ordinance that prohibited the placement of a group home for the mentally retarded in a residential area but allowed all other types of residential dwellings. *Id.* at 450, 105 S.Ct. at 3259–60. The Court's analysis focused on

whether the group home "would threaten legitimate interests of the city in a way that other permitted uses such as boarding houses and hospitals would not." *Id.* at 448, 105 S.Ct. at 3258–59.

The present case requires similar analysis, and there is no indication in the record that the district court made this vital inquiry. The City implies that it has no choice but to locate the American Legion and the Veterans of Foreign Wars in the C–3 zone because these organizations have liquor licenses and state law prohibits liquor establishments in residential areas. However, while adherence to state law would likely be deemed a legitimate justification for treating similarly situated entities differently,[10] this explanation could not possibly justify allowing groups such as Alcoholics Anonymous in the C–3 zone.[11] Alcoholics Anonymous and the Masonic Lodge do not hold liquor licenses and their internal by-laws prohibit them from obtaining a license, yet theirs are permitted uses. The City offers no other justification for its distinction between churches and other non-commercial entities.[12]

The Church has placed the City's rationale for excluding churches at issue. The City is excluding the Church because it will not generate economic activity, but the Church has established a relevant similarity between itself and permitted non-commercial entities. It now is incumbent on the City to provide the rational basis for this apparent unequal treatment of similarly situated entities. The City has failed to support its exclusion of the Church with any justification beyond the conclusory statements in the affidavits of the city

seling or services likely would also patronize the C–3 businesses.

10. We do not decide whether the City in fact is compelled under state law to locate liquor establishments in the C–3 zone.

11. The City implies that it allows non-commercial entities in the C–3 zone if they are *eligible* for a liquor license. *City Brief* at 24. If this is the City's distinction it is unavailing, for the Church too is eligible for a liquor license.

12. The City does offer the tautological argument that Birthright and Alcoholics Anonymous are

allowed in the C–3 zone because they fall under the category of "professional and medical services." *City Brief* at 25. It is meaningless to argue that a land-use is allowed under the ordinance because the ordinance allows it. For equal protection analysis the relevant inquiry is whether allowing one non-commercial entity but excluding another is rational in light of the purposes of the ordinance. Thus, the issue is whether Birthright and Alcoholics Anonymous generate economic activity more or less than the Church.

472

planners. *Church App.* at 128–35. Thus, summary judgment was not appropriate and the district court on remand should determine whether the City has a rational basis for treating the Church differently from the permitted entities.[13]

## C. FREE EXERCISE

■ The Church argues the zoning ordinance violates its first amendment right to free exercise of religion in two ways: the ordinance directly regulates religious worship and also infringes on its "hybrid rights" to free speech and religion. The Church's claims thus follow the two remaining paths for advancing a free exercise claim after the Court's decision in *Employment Div., Dep't of Human Servs. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

In *Smith*, the Court held that a neutral law of general applicability that incidentally impinges on religious practice will not be

subject to attack under the free exercise clause. *Id.* 110 S.Ct. at 1600. However, the Court left open the viability of free exercise attacks on government actions that directly regulate religious belief or religious-based conduct, *id.* 110 S.Ct. at 1599, or that violate the first amendment in conjunction with other constitutional protections. *Id.* 110 S.Ct. at 1601.

The ordinance has no impact on religious belief and should not be construed as directly regulating religious-based conduct.[14] The ordinance is a general law that applies to all land-use in Hastings. There is no evidence that the City has an anti-religious purpose in enforcing the ordinance.[15] Absent evidence of the City's intent to regulate religious worship, the ordinance is properly viewed as a neutral law of general applicability and under *Smith* summary judgment on this free exercise claim was appropriate.[16]

---

**13.** The Church claims the City's rationale for treating churches differently from other noncommercial entities should be subject to strict scrutiny. Although courts typically give broad latitude to legislative initiatives concerning economic regulation, *New Orleans v. Duke*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976) (per curiam), the Church relies on the statement in *Cleburne* that a heightened standard of review is required "when state laws impinge on personal rights protected by the Constitution." 473 U.S. at 440, 105 S.Ct. at 3254. However, in an analogous circumstance of racial discrimination in which plaintiffs sought strict scrutiny the Court stated that "our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact." *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Absent evidence of purposeful discrimination based on religious status, the rational basis standard should apply. The disparate impact of the ordinance on the Church is insufficient to support an inference of discriminatory purpose, *see Davis*, 426 U.S. at 242, 96 S.Ct. at 2049; *see also Williams v. Anderson*, 562 F.2d 1081, 1087 (8th Cir.1977), particularly in light of the City's efforts to accommodate the Church.

**14.** The cases cited by the Church are relevant factually but all were decided prior to *Smith*. *See Islamic Center of Mississippi, Inc. v. City of Starkville*, 840 F.2d 293 (5th Cir.1988); *Messiah Baptist Church v. County of Jefferson*, 859 F.2d

820 (10th Cir.1988), *cert. denied*, 490 U.S. 1005, 109 S.Ct. 1638, 104 L.Ed.2d 154 (1989); *Lakewood, Ohio Congregation of Jehovah's Witnesses v. City of Lakewood*, 699 F.2d 303 (6th Cir.), *cert. denied*, 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *Grosz v. City of Miami Beach*, 721 F.2d 729 (11th Cir.1983), *cert. denied*, 469 U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984). In any event, the courts upheld the zoning ordinances in three of the four cases. In the other case the city had permitted twenty-five Christian churches in an area but prohibited a Muslim mosque. *Islamic Center*, 840 F.2d at 297. The court accordingly found that the ordinance as enforced was discriminatory against Muslims and violated their free exercise rights. *Id.* at 302–03. The facts of *Islamic Center* go well beyond the present case.

**15.** Indeed, the City has attempted to accommodate the Church by indicating its approval of a zoning change for the Church's property on Third Street. The City also has granted the Church a number of extensions of time to find another location.

**16.** This result is consistent with a recent Second Circuit case involving enforcement of an historic preservation ordinance to restrict a church's right to develop its property. *Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v. City of New York*, 914 F.2d 348 (2d Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1103, 113 L.Ed.2d 214 (1991). St. Bartholomew's Church owned a seven-story building in the heart of Manhattan that was designated an historical landmark under a city ordinance.

■ The Church also bases its free exercise challenge on the fact that the ordinance violates the congregation's free speech and equal protection rights along with its free exercise rights. The Supreme Court in *Smith* observed that "[t]he only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press...." 110 S.Ct. at 1601. The district court rejected this "hybrid rights" claim in light of its grant of summary judgment to the City on the Church's free speech, freedom of association, equal protection, and due process claims. Our reversal of the summary judgment orders breathes life back into the Church's "hybrid rights" claim; thus, the district court should consider this claim on remand.

## D. DUE PROCESS

■ The Church contends the City's zoning ordinance is unduly vague, leaving its interpretation to the "unbridled discretion" of the city planner.[17] The alleged flaw in the ordinance is its failure to define terms such as "church," "private club," and "economic activity," which serve to identify permitted and excluded uses. The Church relies entirely on a statement in *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), in which the Court identified three important values offended by vague laws.

The *Grayned* Court stated that a vague law fails to provide citizens reasonable notice of what the law prohibits and allows, and thus will "trap the innocent by not providing fair warning." *Id.* at 108, 92 S.Ct. at 2298. The Hastings zoning ordinance is not such a trap. The ordinance is specific in listing seven broad categories of permitted uses and more than thirty examples. It explicitly indicates where churches are allowed and although it does not explicitly prohibit churches in the C–3 zone, that prohibition is reasonably implied by the omission of churches as a permitted use.

The second concern articulated in *Grayned* was that a vague law "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108–09, 92 S.Ct. at 2298–99. In the present case the City Council has made the basic policy decisions and has essentially left only the mechanics to the city planner. The City Council has established the zoning policy and objectives for each zone and has enumerated a comprehensive list of permitted uses in the C–3 zone. No legislative body developing a zoning plan could be expected to envision every potential land-use, and it is quite plausible that the Council did not foresee the possibility that a church would seek to locate in a storefront in the central business district. The resulting gap in the ordinance has been interpreted by the city planner in light of the overall objectives for the C–3 zone. The City's statement of objectives, along with available review procedures, sufficiently constrains the city

The church wanted to tear down the landmark and build an office tower to further its charitable and ministerial program, but the city refused permission. The church filed suit claiming, inter alia, that the ordinance violated its rights under the free exercise clause.

The Second Circuit applied *Smith* and found the landmark ordinance a neutral regulation of general applicability. *Id.* at 355. Although the ordinance "drastically restricted the Church's ability to raise revenues" and despite the fact that approximately fifteen percent of all designated landmarks were churches, the court found no evidence of an intent to discriminate

against religious worship. *Id.* at 354–55. The Second Circuit concluded that "no First Amendment violation has occurred absent a showing of discriminatory motive, coercion in religious practice or the Church's inability to carry out its religious mission in its existing facilities." *Id.* at 355.

17. Before the district court the Church also claimed that the city planner's decisions were not subject to meaningful review, but the Church does not press this contention on appeal. Clearly the Church has exercised its ability to appeal the city planner's decisions to the City Council.

planner's discretion.[18]

The third concern of the *Grayned* Court was that "where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,'" it chills First Amendment activity by causing citizens to "'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109, 92 S.Ct. at 2299. Although first amendment freedoms are implicated here, there is no serious risk of chilling religious activity. The ordinance is not vague and has only a tangential effect on religion.

Having addressed all the due process concerns raised by the Church and finding them unfounded, we affirm the district court's grant of summary judgment in favor of the City on this claim.

## SUMMARY

The district court's order of summary judgment with respect to the Church's free speech and equal protection claims is reversed and remanded for trial. The order of summary judgment with respect to the Church's free exercise claim is affirmed except for the "hybrid rights" claim, which is reversed and remanded for further consideration. The order of summary judgment with respect to the Church's due process claim is affirmed.[19]

---

18. To the extent that the Church claims that the city planner has discriminated against religious expression, that argument is more appropriately considered as part of the Church's equal protection claim. As we observed in remanding the Church's equal protection claim, the City has some way to go in providing a rationale for its distinction between the permitted non-commercial uses and the Church. However, any improper discrimination resulting from the City's enforcement of the ordinance is not due to a vagueness problem in the text of the ordinance. The text is reasonably and concisely drafted and is not vague. The terms "church," "private club," and "economic activity" are familiar terms from common experience and are not unduly ambiguous. Thus, if the ordinance is invalidated it will be because of the assumptions the City has made about the specific land-uses at issue, not because of inherent problems in the text of the ordinance.

19. Despite a passing reference in its brief to its freedom of association claim, *Church Brief* at 36 n. 95, the Church has not raised on appeal the district court's grant of summary judgment for the City on its freedom of association claim.