Milton WEIR, Plaintiff,

v.

Crispus NIX, James Helling, Mary Piper, and the State of Iowa, Defendants.

Civ. No. 4–91–cv–30463.

United States District Court,
S.D. Iowa,
Central Division.

May 25, 1995.

774

Patrick E. Ingram, Mears Law Office, Iowa City, IA, for plaintiff.

Kristin W. Ensign, Iowa Asst. Atty. Gen., Des Moines, IA, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

WALTERS, United States Magistrate Judge.

Plaintiff, an inmate at the Iowa State Penitentiary ("ISP") in Fort Madison, Iowa, brings this action pursuant to 42 U.S.C. § 1983 and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb–2000bb–4 (1988). The Court has jurisdiction by reason of 28 U.S.C. §§ 1331 and 1343(a)(3). The matter came on for trial on December 13, 1994. Plaintiff appeared and was represented by his attorney, Mr. Patrick Ingram. Defendants were represented by Iowa Assistant Attorney General, Kristin W. Ensign. The parties previously consented to trial by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and the matter was referred to the undersigned.

### I.

This action involves, principally, the rights of plaintiff Milton Weir as a protective custody inmate and fundamentalist Christian to the free exercise of religion guaranteed by the First Amendment to the Constitution of the United States and, more recently, the Religious Freedom Restoration Act of 1993 (RFRA), Pub.L. 103–141, 107 Stat. 1488 (now codified at 42 U.S.C. §§ 2000bb–2000bb–4). Plaintiff claims that prison policies and practices restrict his free exercise of religion in various particulars and, with respect to a number of publications withheld from him,

his First Amendment right to free speech or expression. He also alleges that in some circumstances he has been denied equal protection of the laws with respect to the exercise of his religious beliefs, and that defendants have violated a decree in another case decided in this district involving the status of protective custody inmates. Plaintiff sues the penitentiary's former warden, Crispus Nix, its correctional treatment director, James Helling, and a mail room clerk, Mary Piper. Helling has supervisory responsibility for religious activity at ISP. Piper is sued only in connection with an incident in which Weir was not allowed to receive certain publications. The State of Iowa is sued on the RFRA claim.

In view of the breadth of plaintiff's complaints and their evolvement through the course of litigation, the Court, at the conclusion of the trial, directed plaintiff to file a post-trial brief indicating with specificity what relief was requested in light of the evidence presented. Plaintiff's counsel complied and plaintiff's post-trial brief identifies the issues with accompanying requests for declaratory relief, injunctive relief, and damages. The issues identified by plaintiff provide an appropriate framework for the findings of fact and discussion which follows. The Court has carefully considered the record evidence, the arguments and statements of counsel, and now finds and concludes as follows on the issues presented.

### II.

### FINDINGS OF FACT

*Weir's fundamentalist beliefs.* Plaintiff Milton Weir is an inmate at ISP where he has been confined since 1986. He is incarcerated voluntarily in protective custody. Weir is a graduate of Faith Baptist Bible College in Ankeny, Iowa where, Weir testified, he received bachelor's and master's degrees. Weir converted to biblical Christianity at age eighteen. At the time of trial he was thirty-five.

Weir professes to be a fundamentalist Christian. His education, obvious familiarity with doctrine, and determined pursuit of his beliefs in prison lead the Court to conclude

he sincerely believes in fundamental Christianity. In addition, two fundamentalist pastors, John Raney and Gerald Howarth, testified they were acquainted with Weir, that he has shown himself knowledgeable of Bible doctrine and, according to Howarth, is a "scholar of the Word."

■ Defendants point out that pornography is inconsistent with fundamentalist belief and introduced evidence that as late as a week or two before trial Weir received an allegedly pornographic publication, the most recent of a number of publications of this type received by Weir over the years. Weir denied an interest in pornography generally and the receipt of certain of the publications referred to by the defendants. While conduct inconsistent with an expressed religious belief may call into question the sincerity with which that belief is held, the gap between the ideal and reality is a universal feature of human experience. Viewed against Weir's demonstrated interest and background in fundamentalist Christianity, his periodic receipt of pornographic literature does not require a finding he is insincere in his beliefs.

The evidence in this case suggests there are variations in the doctrine adhered to by persons professing to be fundamentalist Christians. Though they share basic tenets, fundamentalists do not make up a doctrinally homogeneous group. The Court is limited in this case to discussing fundamentalism as explained by Weir and the other witnesses who testified on the subject. With this in mind, the record here indicates that some fundamentalists like Weir consider themselves distinct from Protestants. These fundamentalists do not consider themselves as having broken from the Roman Catholic Church, but rather, as never having been a part of it. They regard themselves as spiritual descendants of the early Baptists. By another view, held by Protestant prison Chaplain Delwin Vande Krol, also a fundamentalist, fundamentalism is a movement within conservative protestantism. Exhibit C.

Regardless of whether fundamentalism is considered within the umbrella of Protestant faith, its core belief is in the literal word of God set forth in the Bible. Included in this are the virgin birth of Jesus Christ, the second coming of Christ, the inerrancy of the Bible, the reality of heaven and hell, the biblical version of creation, and others Weir has outlined in what he refers to as his "doctrinal statement." Exhibit 13. Fundamentalist worship services are non-liturgical and Bible-centered. One belief held by Weir, which is apparently not universal to the fundamentalist movement and has some variation in meaning within it, is the concept of "separatism." This requires adherents to separate themselves from spiritual leaders whose teachings offend fundamentalist precepts. As Pastor Howarth testified, such persons are considered "evil" in the sense that they mislead people as to the truth. Accordingly, fundamentalist churches, said Howarth, do not cooperate with other churches.

There is some uncertainty in the evidence as to whether separatism also requires fundamentalists to separate from other Christians who do not share fundamentalists' beliefs. Chaplain Vande Krol testified that those who are separatists feel they should disassociate from other Christians who believe differently. In a 1992 memorandum, Vande Krol advised defendant Helling that some fundamentalists would consider the inclusive approach he takes to services as sinful. Exhibit C. However, Vande Krol has observed that Weir does not practice this form of separatism and is able to fellowship with persons of other beliefs. Moreover, Weir's own "doctrinal statement" mentions separation only in the context of separation from "false teaching," Exhibit 13, and in his testimony he described it as requiring withdrawal from those whose teachings depart from cardinal doctrine, not withdrawal from non-fundamentalists generally. Pastor Howarth testified a non-believer could participate in fundamentalist services, but could not be a leader. Separatism, therefore, as articulated and practiced by Weir does not appear to require him to refrain from worship, fellowship, or Bible study with members of other faiths. It does prevent him from attending a service led by a person whose

message is significantly inconsistent with fundamentalist beliefs.[1]

*Protestant services at the penitentiary.* Inmates in protective custody have the opportunity to attend Protestant or Catholic services in the prison chapel on Friday. Sunday is reserved for the three cellhouses in the general population, each one of which has services at a different time. Services are conducted by cellhouse so as to minimize the number of inmates allowed to gather at one time, a security consideration, and also because of the chapel's small size. Until about December 1993, the opportunity for group worship in the chapel was limited to one hour per week for all inmates. After a change in wardens, the new warden, Thomas Hundley,[2] increased the worship time from one hour per week to three and also allowed greater access to the prison by outside clergy and lay pastors.

Chaplain Vande Krol is a graduate of a Baptist seminary. He has been a prison chaplain at the penitentiary since November 1990. He is a fundamentalist, but does not teach separatism and he takes an inclusive approach in his services. The Protestant services he conducts feature singing, prayer, and a message. There is no indication that Vande Krol's message is offensive to fundamentalist beliefs in general, or as practiced by Weir. To the contrary, Chaplain Vande Krol's services tend to be fundamentalist. His ministry is generally given high marks by Weir, and the other fundamentalist inmates who testified. Inmate Thomas O'Connell testified Vande Krol is a good teacher. Inmate Michael Mitchell considers Vande Krol very sincere in reaching out to people. Weir testified that Chaplain Vande Krol is doctrinally satisfactory except on the issue of separatism. According to Weir a lot of Chaplain Vande Krol's message is really good. On occasion Vande Krol has asked Weir to give the message during Protestant services for the protective custody inmates.

Immediately following the Friday service, there is now an opportunity for two additional hours of unstructured devotional activities. During this time inmates are free to engage in Bible study, watch video tapes, use the chapel library, or spend time in private contemplation. Occasionally guest or volunteer speakers are available. Chaplain Vande Krol testified it would be possible for inmates so inclined to gather in an adjoining office as a prayer group and he indicated Weir could conduct this. Written department and prison policy encourages the practice of religion of the inmate's choice and appears to allow such "specialized religious procedures" under the direction of the Chaplain. Exhibits 10; G. Weir, however, has not asked Vande Krol for permission to conduct religious observances during the unstructured two hours available each week.[3]

Putting aside the question of the time allowed for worship, Weir seeks declaratory relief in the form of a decree that the prison must provide a chaplain or spiritual advisor

1. It is not clear how many protective custody inmates share Weir's fundamentalist views. Two who testified, Thomas O'Connell and Michael Mitchell, appear to support him. A third, Victor McDaniel, did not know anything about fundamentalist beliefs until the morning of trial. By stipulation, Weir offered affidavits (most of them on identical typed forms) from eleven other protective custody inmates professing beliefs similar to Weir's. Chaplain Vande Krol opined only one or two other inmates share Weir's views. He doubted the sincerity of most who submitted affidavits as he felt inmates with bona fide fundamentalist beliefs would have expressed them to him.

2. Warden Hundley died after the trial of this case.

3. Written prison policy provides that matters such as inmate involvement in services or inmate-led observances be first raised with the Chaplain. Exhibits 10; G. In late August 1990, just before Chaplain Vande Krol came to the prison, Weir submitted a grievance in which he complained about a number of problems with the religious program, including the fact that protective custody inmates could not have an inmate preacher preach or perform services, nor could inmates engage in group Bible study and the like. Exhibit 11. The grievance was rejected without specific response to the nine issues raised by Weir, though the grievance officer suggested that Weir confer with defendant Helling and the Chaplain about Bible study. *Id.* The grievance does not indicate Weir had discussed his complaints with the Chaplain. Chaplain Vande Krol has permitted fundamentalists to participate in the services and is receptive to a separate gathering of fundamentalists during the worship period.

who can offer services consistent with Weir's beliefs, or alternatively, allow inmates to lead fundamentalist services. Plaintiff's Post–Trial Memorandum, at 7–8. However, as noted, Chaplain Vande Krol has religious beliefs not significantly different from Weir's—Vande Krol is not a "false teacher"—and Weir has not shown the simple services led by him are materially inconsistent with his beliefs. The Court finds the present Protestant worship service at the penitentiary and the opportunity for further religious activity following it, does not substantially burden or infringe on the free exercise of Weir's religious beliefs. Nor is Mr. Weir denied an opportunity for group services and religious guidance available to inmates of other faiths.

*Time for worship.* Weir would like more than three hours per week for worship outside of his cell. This is based in part on Pastor Howarth's testimony that about four hours a week would be the minimum in his church. Howarth, and also Pastor Raney to the extent he testified on the subject, include within this time Sunday school and youth meetings. Such family centered devotional activities are inapposite in the prison setting. Moreover, beyond Weir's personal desire for more time, the evidence does not establish that his faith mandates any minimum number of hours of congregate worship each week.[4] Weir has not proved the number of hours allotted for church services and organized worship each week infringes or substantially burdens the free exercise of his religion.

*The baptistery.* The baptismal ceremony is central to fundamentalist Christian belief as articulated by Weir, as it is for Christians generally. It is a confession of faith in the course of which the person being baptized is immersed in water. As a confession of faith it is intended to be done in front of witnesses. The ceremony is also a reaffirmation of faith by those who witness it. Baptisms by immersion used to be done at ISP through use of a tank or tub in the chapel. This was destroyed in a prison disturbance some years ago and never replaced due to an asserted lack of funds. As practiced now, the baptism

ceremony has two parts. As the Court understands it, a portion of the ceremony is incorporated in the worship service. Thereafter Chaplain Vande Krol and the inmate complete the process by using the whirlpool in the prison infirmary. Normally, however, no inmate witnesses are afforded the opportunity to be present. There is not a great deal of evidence on the baptism issue, but the Court believes it is sufficient to establish that the free exercise of fundamentalist Christian belief is infringed upon and substantially burdened by conduct of a significant portion of the baptismal rite in private. This is true both for the person being baptized and those, like Weir, denied an opportunity to participate fully in the service.

There is no evidence that exclusion of other inmates from a baptism in the infirmary furthers a compelling governmental interest, or is the least restrictive means of furthering that interest. If there is a security concern about a group of inmates in the infirmary, not presented here, surely there are less restrictive alternatives to satisfy the governmental interest. The prison once allowed use of a tank or tub in the chapel and could again with little effort and at negligible expense. In any event, defendants have not met their burden here.

*Sunday service.* As noted above, services for inmates in protective custody are on Friday. Weir claims the lack of an opportunity for group worship on Sunday interferes with the free exercise of his religion, and he argues the schedule could be rearranged so that inmates in protective custody could have their services on Sunday.

The prison chapel is a busy place. Prison administrators must accommodate a number of different religious groups: Muslims, the Moorish Science Temple, Native Americans, Jewish, Catholic, Protestant, and the Church of the New Song. Space in the chapel is limited to about thirty inmates at a time. The number of inmates gathered at any one time is controlled for security reasons by conducting services separately by cellhouse for the Protestants and Catholics. As a result, Chaplain Vande Krol does five services

---

**4.** Weir is, of course, free to engage in religious observances such as prayer and Bible study in his cell, and evidently does devote a substantial amount of time to religious study.

on Sunday and he testified it would be difficult for him to do more. Weir admitted that not everyone can worship on Sunday. He argues, however, that Sunday worship is central to his faith.

The evidence does not support a conclusion that worship on Sunday, as opposed to another day, is a tenet or belief that is central to fundamentalist doctrine. To the contrary, it suggests that worship on Sunday is more traditional than doctrinal. Pastor Raney testified worship on Sunday is not a necessity; Pastor Howarth testified that a Christian can worship on any day. Fundamentalists also customarily worship on Wednesday, a time of worship that is not biblically based. Weir testified Sunday was the day the disciples came together, a pattern established in the New Testament church. However, there is no mention of Sunday worship in his doctrinal statement, merely "the right to weekly and regular assemblies of worship." The Court finds Weir has not shown that worship services on Friday instead of Sunday substantially burdens or actually infringes on the exercise of his religious beliefs.

■ *Book limit.* Prison policy allows inmates in the general population and protective custody to have twenty-five books and/or magazines in their cells at any one time. Exhibit E. The limitation is for fire safety purposes. The only inmates who are permitted more books and magazines are inmates in "honor lifer" status, who may have thirty-five books. As a protective custody inmate Weir does not qualify for honor lifer status. In addition to his First Amendment claim, Weir argues that the different treatment of protective custody inmates and "honor lifer" inmates in this regard violates a 1981 consent decree in this district entered in *Parrott v. Ray,* Civil No. 78–174–2 (S.D.Iowa Mar. 6, 1981).

It is not clear how many books Weir claims are necessary for the exercise of his religion. In his testimony Weir stated he needs a "well grounded research library" to further his understanding of the Bible, satisfy his need to dig into the "deep stuff," and mitigate the negative effect the prison environment has on the maintenance of his beliefs. Weir's discussion of the books he would need to satisfy this indicates the number would far exceed twenty-five, or thirty-five. Thus, the ability to have ten more books does not appear to be particularly significant to his free exercise claim. The focus here is on the claim for a sufficient number of books to satisfy Weir's personal need for Bible study. He asserts these would include topical and cultural studies, books on creationism and homiletics, Bible surveys, atlases, encyclopedias, dictionaries, hermeneutics, lexicons, and research works to understand the Greek, Aramaic and Hebrew texts of the Bible.

Chaplain Vande Krol testified the single essential book for fundamentalist Christian study is the Bible. Weir has a Bible in his cell. He also has a number of books to aid in his study and understanding of the Bible, including a three volume set of Bible dictionaries, Strong's Concordance, an "interlinear" Bible, and a number of commentaries. The chapel library has some of the additional books Weir wants: encyclopedias, lexicons, homiletics, systematic theologies, and Bible surveys. Weir cannot check reference books out of the chapel library, but he has the opportunity to use them there.

The limitation on the number of books and magazines Weir may have in his cell at one time is not a limitation on the number of religious books he may obtain. He is free to rotate them and could, for example, donate books to the chapel library for his and others' use there. In fact, Weir has done so in the past. Weir complains books in the chapel are subject to theft and damage, however, during Chaplain Vande Krol's tenure this has not been a problem.

Weir professes an interest in in-depth religious scholarship and the twenty-five book limit plus the resources of the chapel library give him only a limited ability to pursue this interest. It is not surprising in a prison setting that the research tools available are less than ideal. Weir's interest in religious scholarship stems from a personal avocation and desire to escape the debilitating atmosphere of prison life. There is no evidence, however, of a tenet or belief central to fundamentalist doctrine which mandates serious scholarship and study or the possession of an extensive library to the extent of Weir's in-

terest as a part of the exercise of fundamentalist beliefs. The inquiry is whether the limitation substantially burdens or infringes upon the free exercise of Weir's religious beliefs. In a religion which recognizes only one book as essential, it is difficult to conclude a cell limit of twenty-five books or magazines, coupled with the resources of the chapel library, so impairs an understanding of the Bible as to amount to a substantial burden or infringement. At least, the evidence here fails to show that is the case.

■ The *Parrott* decree is not violated by allowing "honor lifers" to have more books than others, including protective custody inmates. No provision of the decree addresses differences in privileges for "honor" inmates, personal property generally, or books and magazines specifically. The decree sets out a rule of construction that ambiguities are to be resolved with reference to the decree's purpose "to promote ... as nearly as possible the same conditions of confinement" for protective custody and general population inmates, but, as noted, there is no pertinent provision in the decree to which this rule may be applied. *See Parrott,* Stipulation, at 17. Moreover, there is no showing that, but for his status in protective custody, Weir would presently qualify for honor lifer status.[5]

*Bibles in the prison yard.* Weir next complains that general population inmates are allowed to take Bibles into the prison yard, but protective custody inmates are not, and, in any event, the restriction impermissibly burdens the exercise of his religion. In fact, the prison's policy is that all inmate property is to remain in the inmate's cell with certain enumerated exceptions. Exhibit E, at 10. One exception allows religious items to be taken to and from religious functions. *Id.* The policy applies alike to general population and protective custody inmates. There should not be a difference in treatment. Prison security director John Emmett admitted there could be variances in vigilance as between individual correctional officers. As a practical matter pocket-sized Bibles can often be taken into the yard without detection. The evidence, however, does not prove any discriminatory policy or practice on this subject between inmates in the general population and those in protective custody.

■ The proscription against personal property in the yard is intended to reduce the opportunities for bartering, theft, movement of contraband (items such as blades and drugs can be concealed in a book or its binding), and the like, all potential sources of disruption and hence threats to prison security.[6] Moreover, the prison administration has attempted to mitigate the effect of the ban on inmate property outside of the cells by placing copies of the Bible and the Koran in the gym, library, and visiting rooms. It appears, however, that these are often stolen or damaged and there is no regular inspection to ensure their continuing presence.

Weir has not established that the prohibition on personal property outside of inmate cells substantially burdens, or infringes upon, his free exercise of religion. It has no significant impact on his individual opportunity for Bible study. Protective custody inmates spend most of their time in their cells where they are free to read the Bible, and under the current policy inmates are afforded ample time for group worship and Bible study. That inmates are not also able to read and study the Bible in the yard does not signifi-

---

**5.** Weir states that his complaint about the in-cell book limit would be mitigated if the prison administration would abandon the "publishers only" rule which mandates that religious and other books and magazines must come from the publisher or a reputable book store, and allow him to have photo copies of religious material in his cell. This court has previously determined that the rule presents a "reasonable accommodation" of competing interests with respect to religious publications. *Hazen v. Reagen,* Civil No. 75–201–1, at 17–18 (S.D.Iowa Feb. 20, 1985). While abrogation of the publishers only rule in whole or in part might amount to a less restrictive alternative, that issue is not presented unless the Court first concludes the book limit substantially burdens Weir's exercise of religion, a fact Weir has not established. 42 U.S.C. § 2000bb–1(b).

**6.** It is well established that maintaining internal order and institutional security is "central to all other correctional goals." *Thornburgh v. Abbott,* 490 U.S. 401, 415, 109 S.Ct. 1874, 1882, 104 L.Ed.2d 459 (1989). *See e.g., Bettis v. Delo,* 14 F.3d 22, 23 (8th Cir.1994).

cantly reduce the time available for these activities. No belief central to fundamentalism has been identified which requires constant possession of a Bible or the opportunity to read and study it at all times and places.

The absence of the Bible does impair to a degree Weir's ability to engage in evangelism and spiritual counselling in the yard as the Bible is a useful tool for these purposes. These activities are a part of the exercise of Weir's beliefs. The question here is closer because it can be inferred from the evidence that yard time is one of the few times protective custody inmates can have relatively free association with one another. There is, therefore, some burden to the exercise of Weir's beliefs. The Court is unable to conclude, however, that it is substantial when the totality of the evidence is considered. As noted, the restriction has little impact on Weir's own devotions. There is an opportunity for Bible study in connection with the Friday services. While it would be helpful to have the Bible available for evangelism and spiritual counselling of other inmates, Weir's knowledge of the subject makes its absence less critical. Also, Weir has the opportunity to use the Bible in his cell or in the chapel to prepare for evangelism and counselling efforts in the yard.

■ *Chick Publications.* In March 1992 eight comic book-like pamphlets Weir had ordered from Chick Publications were received at ISP and rejected. Weir was given a Notice of Rejection form which cited as the reason for rejection that the publications had been "disapproved by Publications Review Committee" of the Iowa Department of Corrections. Exhibit 1. The staff person responsible for the rejection was identified as "D. Dressler." *Id.* The publications in question are entitled: *Angel of Light, Spellbound, Double–Cross, The Godfathers, The Force, Four Horsemen, King of Kings,* and *The Big Betrayal.* The Publications Review Committee is established by departmental regulation to determine whether a publication will be allowed into the ISP and other Iowa penal institutions. 201 Iowa Admin.Code 20.6. If

a publication is disapproved, it is placed on a denied list which ISP mail room personnel use to identify such publications. The eight publications at issue here were on the list. Exhibit D.

The institution's treatment of Chick Publications has been inconsistent. Weir testified that in 1987 he received a quantity of Chick Publications, including *King of Kings,* a fact noted in the findings of Judge Bennett in a case involving the same publications, *Lyon v. Grossheim,* 803 F.Supp. 1538, 1543 (S.D.Iowa 1992). When Weir again ordered similar publications in 1992, they were rejected. At the time the *Lyon* case was pending. By decision entered September 30, 1992 Judge Bennett found that the publications were neither disruptive nor likely to produce violence and, applying the analysis articulated in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), further concluded the applicable prison regulations, as applied to the publications in question, were not reasonably related to a legitimate penological interest. Thus, the denial of the publications violated Lyon's rights under the First Amendment. *Id.* at 1554–55.[7]

In his decision Judge Bennett briefly outlined the content of each of the publications. *Id.* at 1541 n. 8. The Court will not do so again here. It is sufficient to note that the content of many of the publications would be deeply offensive to many members of the Roman Catholic faith and, to a lesser extent, persons of various other faiths or beliefs. Fundamentalism, as held by Weir and Pastors Raney and Howarth, is strongly opposed to Roman Catholic doctrine and the institution of the Roman Catholic church. This sentiment finds full expression in the Chick Publications. This fundamentalism, however, does not advocate violence against individual Catholics and none of the eight publications in question urge violent acts or disruption. Some of the publications are more benign than others. For example, *King of Kings* is largely a collection of Bible stories depicted in pictures. But even one of the more virulent of the titles, *Four Horsemen,* concludes

7. *Lyon* was not decided as a free exercise claim, but rather as a free speech or expression claim.

803 F.Supp. at 1548 n. 25.

by exhorting "true Bible believers [to] pray for love and the precious Roman Catholics enough to tell them the truth."

The only evidence offered by defendants as to why the publications were denied to Weir was the testimony of treatment director James Helling that they were viewed as being negative toward other religious groups and therefore possibly inciteful. Among his various duties, Helling supervises the mail room. Mr. Helling, however, was not on the Publication Review Committee and it is apparent he is not aware of the contents of the publications other than an understanding that they are negative toward Catholics. Beyond Helling's general statement, nothing is offered to support a reasoned conclusion that the content of the publications could be viewed as likely to be disruptive or produce violence, the asserted basis for exclusion. *Lyon*, 803 F.Supp. at 1549; 201 Iowa Admin.Code 20.6(4)(a). As noted, at times Weir has had access to Chick Publications, and presumably Lyon received them as directed by the judgment in his case. There is no evidence that Chick Publications have in fact been disruptive or a factor in any prison violence. On this record, even more so than in *Lyon*, any claim the exclusion of these publications serves legitimate penological objectives is purely conjectural. *Lyon*, 803 F.Supp. at 1554, 1558.

The present status of the Chick Publications at ISP is murky. Defendant Mary Piper, the penitentiary mail clerk who allegedly intercepted the publications, was unclear on the subject, though apparently one of the publications, *The Big Betrayal*, has been expressly approved. Mr. Helling testified that if a court has approved a publication, it should be on the approved list. For some unexplained reason, that has not happened in the case of the Chick Publications at issue here and in *Lyon*. Some or all appear to remain on the denied list. The issue, however, has not been tested again by Weir since March 1992 or following the *Lyon* decision.

Defendant Piper is alleged to have been involved in the rejection of the Chick Publications, but the evidence does not show this to have been the case. Weir was informed the staff person responsible for the rejection was D. Dressler. In any event, as a mail room clerk, Piper did not have the authority or discretion to determine what publications to allow into the institution. There is no evidence defendants Nix or Helling had any substantial involvement in the decision to exclude the publications beyond their supervisory functions.

■ To the extent Weir's claim to the Chick Publications is founded on the Free Exercise Clause of the First Amendment, he has not shown they were essential or important to the exercise of his religion. Neither Weir nor his witnesses testified the publications were important to the exercise of fundamentalist beliefs. Accordingly, their absence did not substantially burden or infringe upon the exercise of Weir's religion.

*Disciplinary Segregation/Lockup.* Finally, Weir challenges the inability of inmates in disciplinary segregation to attend group religious services. The only evidence on this subject was Chaplain Vande Krol's testimony that inmates in lock-up cannot attend services, but have access to services on television and religious literature. This was echoed by Weir, who testified there is no opportunity for formal or congregate worship in lock-up, but the Chaplain will come by the cell, on request, though not often. Weir did not complain of any specific instance in which he was placed in disciplinary segregation and denied an opportunity for worship. The brief references in the record to this issue are not sufficient for reliable factual findings.

## III.

## CONCLUSIONS OF LAW

### The Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act

■ The Free Exercise Clause to the First Amendment to the United States Constitution provides that "Congress shall make no law ... prohibiting the free exercise [of religion]...." It is applicable to the states by incorporation into the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

Prisoners have the right to a reasonable opportunity to exercise their religious beliefs. *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972).

> [T]he 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation.

*Employment Division v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990).

■ One who claims a challenged government action violates his or her free exercise of religion must first establish that the belief in question is religious in nature, is sincerely held, and that the government action actually infringes upon the free exercise of the individual's belief. *Sherbert v. Verner,* 374 U.S. 398, 403–04, 83 S.Ct. 1790, 1793–94, 10 L.Ed.2d 965 (1963); *Brown–El v. Harris,* 26 F.3d 68, 69 (8th Cir.1994); *Iron Eyes v. Henry,* 907 F.2d 810, 813 (8th Cir.1990); *Hill v. Blackwell,* 774 F.2d 338, 342 (8th Cir.1985). The required threshold showing of an actual infringement upon a sincerely held religious belief is not satisfied unless the infringement amounts to a "substantial burden" on the exercise of the belief as now expressly codified in RFRA. 42 U.S.C. § 2000bb–1(b). The requirement of a "substantial" burden differentiates those burdens which have only an incidental effect or merely inconvenience the exercise of the person's religion from those which burden the exercise of the religion by "pressuring [the adherent] to commit an act forbidden by the religion or by preventing him or her from engaging in conduct or having a religious experience which the faith mandates." *Graham v. Commissioner of Internal Revenue,* 822 F.2d 844, 850–51 (9th Cir.1987), *aff'd sub nom, Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989). *See Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir.1995); *Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir.1995); *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1393 (9th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 510, 130 L.Ed.2d 417 (1994); *United States v. Means,* 858 F.2d 404, 407 (8th Cir.1988), *cert. denied,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 575 (1989). Only the latter are constitutionally or statutorily significant. Thus, as the *Graham* court summarized, the "burden must be substantial and an interference with a tenet or belief that is central to religious doctrine." *Graham,* 822 F.2d at 851; *see also Werner,* 49 F.3d at 1480.

If the required threshold showing is made the applicable standard from that point depends upon whether RFRA or the case law it was designed to replace applies to the claim. RFRA was intended to turn the clock back with respect to free exercise claims. In *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) the United States Supreme Court applied what came to be known as the "compelling interest test" which, in substance, required a showing of a compelling state interest and the absence of less restrictive alternatives to justify any substantial burden on a person's exercise of religion. *Sherbert,* 374 U.S. at 406, 83 S.Ct. at 1795; *Yoder,* 406 U.S. at 214, 92 S.Ct. at 1532. Later, in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), a free speech case, the Supreme Court examined First Amendment rights in a case involving censorship of prisoner mail. The Court observed that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression" and that "limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.* at 413–14, 94 S.Ct. at 1811. *Martinez,* however, was not really a prisoner's rights case as it turned on the First and Fourteenth Amendment rights of non-prisoners to receive mail from prisoners. *Id.* at 409, 94 S.Ct. at 1809.

In 1987 the Supreme Court expressly addressed the question of whether the compelling interest test applies to regulations alleged to violate a prisoner's constitutional rights. *See Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). *Tur-*

*ner* involved state prison regulations regulating inmate marriages and inmate-to-inmate correspondence. *Id.* at 81, 107 S.Ct. at 2257. The Court held: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. at 2261. The Court identified four relevant factors in determining the reasonableness of a regulation.

> First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it.... A second factor ... is whether there are alternative means of exercising the right that remain open to prison inmates.... A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally.... Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

*Id.* at 89–91, 107 S.Ct. at 2261–63. Later the same term the Supreme Court applied the *Turner* reasonableness standard to a prisoner free exercise claim involving Muslim inmates' inability to attend a special type of Muslim service. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349–50, 107 S.Ct. 2400, 2404–05, 96 L.Ed.2d 282 (1987). In so doing the court recognized the "reasonableness" test applicable to prison regulations alleged to infringe constitutional rights was "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* at 349, 107 S.Ct. at 2404.

Neither *Turner* nor *O'Lone* affected the requirement of a threshold showing of an actual infringement or substantial burden on the exercise of religion in order to establish a claimed violation of the Free Exercise Clause. Indeed, this is implicit from the holding in *Turner* that the reasonable relationship test is triggered "when a prison regulation impinges on inmates' constitutional rights...." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261.

In 1990 the Supreme Court rejected applicability of the compelling interest test to free exercise challenges involving generally applicable criminal laws. *Employment Division*, 494 U.S. at 885–86, 110 S.Ct. at 1603–04. Respondents in *Employment Division* had violated an Oregon criminal statute against the use of peyote and as a result were fired from their employment and denied unemployment compensation. They claimed they had used the peyote "for sacramental purposes at a ceremony of the Native American Church." *Id.* at 874, 110 S.Ct. at 1597. The Court held that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " *Id.* at 879, 110 S.Ct. at 1600. The case was seen as a retreat from *Sherbert* and *Yoder* in favor of a "rational relationship" test. *See* S.Rep. No. 103–111, 103rd Cong., 1st Sess. 7–8 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1897. Congress responded with the enactment of RFRA in 1993. Pub.L. 103–141, 107 Stat. 1488 (now codified at 42 U.S.C. §§ 2000bb–2000bb–4).

RFRA's express purpose is to repudiate the standard applied in *Employment Division* and "to restore the compelling interest test as set forth in [*Sherbert* and *Yoder* ] and to guarantee its application in all cases where free exercise of religion is substantially burdened ... and ... to provide a claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. § 2000bb(b). The substantive provisions adopted to effectuate this restoration are simple and direct. Government may not "substantially burden a person's exercise of religion" unless the government demonstrates the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(a), (b). A person whose rights under the statute are violated may "obtain appropriate relief against a government" in a judicial proceeding. *Id.* 2000bb–1(c). "[T]he term 'government' includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, a State, or a subdivision of a State." *Id.* § 2000bb–2(1).

The statute is retroactive. *Id.* § 2000bb–3(a). The legislative history indicates the act was intended to apply to prisoners, and it has since been so held. S.Rep., *supra*, at 9–11; *see Werner,* 49 F.3d at 1479; *Brown–El,* 26 F.3d at 69.

■■■■■ Weir seeks both equitable relief and, with respect to certain claims, money damages. His equitable claims for declaratory judgment and injunction are governed by RFRA. His damage claims, however, are not. As Judge Bennett noted in his Order of June 23, 1994 granting Weir leave to amend to assert a RFRA violation, the complaint, as amended, does not plead money damages under the Act. Order at 5 n. 5. Further, RFRA does not expressly waive the State's sovereign immunity under the Eleventh Amendment to the United States Constitution with the result that RFRA defendants cannot be sued for money damages in their official capacities. *Rust v. Clarke,* 851 F.Supp. 377, 380–81 (D.Neb.1994). *See also Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 97–103, 104 S.Ct. 900, 906–09, 79 L.Ed.2d 67 (1984). Finally, RFRA became effective November 16, 1993 at about the time of the changes at ISP extending the hours and opportunities for group religious activity. As Weir notes in his brief, RFRA does not apply to money damages for injuries prior to the effective date of the statute. Post–Trial Memorandum, at 2. Accordingly, Weir's damage claims are governed by the *Turner/O'Lone* reasonableness standard. This being said, as with the RFRA standard, in no instance is it necessary to apply the reasonableness standard here as Weir has not made a prima facie showing of an actual infringement or substantial burden on the free exercise of his religion other than with respect to the baptism issue, in connection with which he does not claim damages. Post–Trial Memorandum, at 10.

### Equal Protection

■■■■ Weir claims that prison practices or regulations have deprived him of the equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution in what the Court understands to be two particulars: by not affording fundamentalists the same opportunity for group worship allowed to other religions, and by not allowing protective custody inmates to take the Bible into the exercise yard when inmates in the general population may do so.

■■■■■ The Equal Protection Clause prohibits religious discrimination by the state. *Native American Council of Tribes v. Solem,* 691 F.2d 382, 384 (8th Cir.1982). To the extent Weir's equal protection claims are based on religious classifications the compelling interest test would apply, *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); the reasonableness test would govern his remaining equal protection claims. *Thomas v. Gunter,* 32 F.3d 1258, 1261 (8th Cir.1994); *Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990); *Williams v. Lane,* 851 F.2d 867, 881–82 (7th Cir.1988), *cert. denied,* 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989). Weir must first establish that a constitutional violation occurred. An essential element of an equal protection claim is proof "that the state has failed to treat similarly situated persons alike." *Abdullah v. Gunter,* 949 F.2d 1032, 1037 (8th Cir.1991), *cert. denied,* 504 U.S. 930, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992); *Cornerstone Bible Church v. City of Hastings,* 948 F.2d 464, 471 (8th Cir.1991). While the state cannot categorically grant or deny benefits and privileges based on religious classifications it does not, however, have an obligation to allocate resources equally among all religious groups at the prison. *Cruz v. Beto,* 405 U.S. at 322 & n. 2, 92 S.Ct. at 1081 & n. 2; *Butler–Bey v. Frey,* 811 F.2d 449, 453–54 (8th Cir.1987). Privileges allowed one religious group "need only be substantially, not literally, equivalent." *Remmers v. Brewer,* 361 F.Supp. 537, 542 (S.D.Iowa 1973), *aff'd,* 494 F.2d 1277 (8th Cir.1974), *cert. denied,* 419 U.S. 1012, 95 S.Ct. 332, 42 L.Ed.2d 286 (1974); *accord Cruz,* 405 U.S. at 322 n. 2, 92 S.Ct. at 1082 n. 2.

■■■■ To prove an equal protection violation Weir must also prove defendants' actions were motivated by a discriminatory purpose. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d

Cir.1995); *Foster v. Wyrick,* 823 F.2d 218, 221 (8th Cir.1987).

### Declaratory Relief With Respect To Past Practices

 Included within Weir's claims for equitable relief is a request for a declaration that the former practice of allowing only one hour of group religious worship per week and the lack of an opportunity for group Bible study prior to the December 1993 policy changes violated Weir's free exercise rights. In a declaratory judgment action the court "may" declare the rights of the parties. 28 U.S.C. § 2201(a). Declaratory relief, like injunctive relief, is discretionary. *See Reno v. Catholic Social Services, Inc.,* — U.S. —, —, 113 S.Ct. 2485, 2495, 125 L.Ed.2d 38, 55 (1993); *USF & G Co. v. Murphy Oil USA, Inc.,* 21 F.3d 259, 260–61 (8th Cir.1994); *Aetna Casualty & Surety Co. v. Jefferson Trust and Savings Bank,* 993 F.2d 1364, 1366 (8th Cir.1993); *Lyon,* 803 F.Supp. at 1556. In considering the exercise of this discretionary jurisdiction, the question is whether there is a substantial controversy between the parties "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Preiser v. Newkirk,* 422 U.S. 395, 402, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)).

> Where it is uncertain that declaratory relief will benefit the party alleging injury, the court will normally refrain from exercising its equitable powers.... This is especially true where the court can avoid the premature adjudication of constitutional issues.

*Penthouse International, Ltd. v. Meese,* 939 F.2d 1011, 1020 (D.C.Cir.1991), *cert. denied,* 503 U.S. 950, 112 S.Ct. 1513, 117 L.Ed.2d 650 (1992). Declaratory relief is unlikely to be of any real benefit with respect to former policies and practices unless it is shown there is some likelihood future injury will result from them. *See Rodriguez v. Kincheloe,* 763 F.Supp. 463, 468 (E.D.Wash.1991), *aff'd,* 967 F.2d 590, (9th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1318, 122 L.Ed.2d 704 (1993). This is particularly appropriate in cases involving prison administration because unnecessary declaratory relief, like "overbroad injunctions," risks undue limitation on the discretion prison administrators must have in dealing with difficult questions of prison administration and security. *See Johnson v. Boreani,* 946 F.2d 67, 72 (8th Cir.1991); *Hamilton v. Schriro,* 863 F.Supp. 1019, 1021–22 (W.D.Mo.1994) (both involving injunctive relief).

Here, there is no evidence that any change in the present policy is being considered, and what, if any, changes may be made in the future is completely speculative. It is, therefore, uncertain whether the declaratory relief requested would benefit Weir. In view of this, and the fact a constitutional issue is involved the resolution of which would impact on the administration of the penitentiary, the Court believes this is an appropriate case in which to decline to exercise its discretionary declaratory judgment jurisdiction with respect to former policies and practices at ISP pertaining to or affecting group worship and Bible study.

### Qualified Immunity

 The defendants plead qualified immunity as an affirmative defense. "The qualified immunity inquiry involves a two-step process." *Munz v. Michael,* 28 F.3d 795, 799 (8th Cir.1994). Weir must first establish violation of a clearly established constitutional right. The defendants are immune from suit or money damages in their individual capacity unless

> (1) their conduct violated a constitutional right of the plaintiff-prisoner that was clearly established prior to the time of the alleged acts of the prison officials; (2) they knew or should have known of the clearly established right at the time of the violation; and (3) they knew or should have known that their conduct violated that right.

*Brown v. Frey,* 889 F.2d 159, 165 (8th Cir. 1989), *cert. denied,* 493 U.S. 1088, 110 S.Ct. 1156, 107 L.Ed.2d 1059 (1990); *see also Ricker v. Leapley,* 25 F.3d 1406, 1409 (8th Cir. 1994). To be clearly established " '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' "

*Mahers v. Harper,* 12 F.3d 783, 785 (8th Cir.1993) (citation omitted); *accord Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

 "This standard does not inquire into the subjective good faith of [prison] officials, but does require that the particular circumstances of the officials' conduct be examined." *Harrison v. Dahm,* 911 F.2d 37, 40 (8th Cir.1990); *accord Mahers,* 12 F.3d at 785. The qualified immunity defense " 'gives ample room for mistaken judgment' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Cross v. City of Des Moines,* 965 F.2d 629, 631 (8th Cir.1992) (quoting *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589, 596 (1991)). Qualified immunity, however, is not a defense to Weir's equitable claims for injunctive or declaratory relief. *Williams v. Delo,* 49 F.3d 442, 445 (8th Cir.1995); *Tubbesing v. Arnold,* 742 F.2d 401, 403–04 (8th Cir.1984).

 As noted above, Weir's damage claims are governed by the *Turner/O'Lone* reasonableness standard. Where the determination of a violation of the Free Exercise Clause turns on the application of this standard to prison regulations or practices, it is difficult for one in Mr. Weir's position, as a practical matter, to overcome the qualified immunity defense except in clear circumstances. This results from the fact that whether a violation of constitutional rights has occurred depends on an understanding of the religious tenets affected by the challenged regulation or practice, an assessment of the extent to which the free exercise of the particular beliefs is burdened, and finally, a balancing of the burden against the penological interests served by the regulation or practice. This process requires an essentially legal analysis and often the outcome is something reasonable minds can differ about. A lay prison employee is not liable in damages merely because he or she fails to anticipate the correct result reached by application of the reasonableness standard in a given instance. "So long as there remains a legitimate question as to whether" a particular action of defendants has violated a constitutional right, "their conduct cannot violate clearly established law, and they will be entitled to qualified immunity." *Harrison,* 911 F.2d at 40. *See, e.g., Mahers,* 12 F.3d at 785–86; *Jackson v. Lockhart,* 7 F.3d 1391, 1394 (8th Cir.1993).

### Group Worship For Disciplinary Segregation/Lockup Inmates

 This issue was not pleaded in the amended and substituted complaint, nor was it one of the issues identified in the final pretrial order. Unlike the baptistery/baptismal ceremony issue, the question of group worship for inmates in disciplinary segregation or lockup was not tried by implied consent. *See* Fed.R.Civ.P. 15(b). The only evidence on the subject is summarized in the Court's findings. Defendants' post-trial brief does not refer to the issue. Under the circumstances it is not evident that both parties recognize the issue entered the case at trial. *See Missouri Hous. Dev. Comm'n v. Brice,* 919 F.2d 1306, 1316 (8th Cir.1990). Even were the Court to conclude the issue was tried by implied consent, the record is simply insufficient to permit the Court to make a reasoned analysis under the RFRA standard. 42 U.S.C. § 2000bb–1. Finally, Weir is not in disciplinary segregation or lockup and there is no showing of any reasonable likelihood that he will be in the future. Accordingly, declaratory and injunctive relief on this subject would be inappropriate. *Johnson,* 946 F.2d at 72; *Rodriguez,* 763 F.Supp. at 468.

### Analysis

As the Court's findings of fact indicate, except with respect to the inability to witness the baptismal ceremony, Weir has failed to establish the final element of a prima facie case: that the practices, policies and conduct he complains of actually infringe upon or substantially burden the free exercise of his fundamentalist Christian religion.

 Weir first claims ISP should provide him and other fundamentalists with a chaplain or spiritual adviser who can conduct services consistent with Weir's beliefs or, alternatively, allow inmates to lead fundamentalist services. He maintains the failure to do or allow this is also a violation of the

Equal Protection Clause. The exercise of religion commonly involves group worship, *Employment Division,* 494 U.S. at 877, 110 S.Ct. at 1599, and when the only option available for a prisoner is under the guidance of someone whose beliefs are significantly different from or obnoxious to his, the prisoner has been effectively denied the opportunity for group worship and the result may amount to a substantial burden on the exercise of his religion. *See SapaNajin v. Gunter,* 857 F.2d 463, 464–65 (8th Cir.1988). A prisoner, however, is not entitled to insist on a religious adviser whose beliefs are completely congruent with his. *See Blair–Bey v. Nix,* 963 F.2d 162, 164 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 620, 121 L.Ed.2d 553 (1992). As the Court has found, the present Protestant chaplain is a fundamentalist Christian whose beliefs vary from Weir's only with respect to the doctrine of separatism. Chaplain Vande Krol understands and preaches the basic tenets of fundamentalist faith. He is capable of ministering to fundamentalist inmates and he has done so to the apparent satisfaction of those who testified. Weir therefore has the opportunity to attend group worship led by a capable, willing religious leader whose beliefs are not significantly different from his own. *See id.* Accordingly, there is no free exercise, RFRA, or equal protection violation here.

■ Weir seeks injunctive relief requiring an additional hour of worship each week, a declaratory judgment that the former practice of allowing one hour of group worship each week violated his right to the free exercise of religion, and damages. For the reasons indicated in the Court's findings of fact, Weir's exercise of religion is not substantially burdened by the present practice of allowing three hours of group worship activities per week as opposed to four. The Court is unconvinced that Weir's faith mandates group worship to the extent demanded by him, and by any standard three hours a week for group worship affords a reasonable opportunity for Weir to exercise his religion. *See Cruz,* 405 U.S. at 322, 92 S.Ct. at 1081. The Court will not exercise its jurisdiction to grant declaratory relief with respect to the former practice of allowing one hour of group worship per week.

■ Weir seeks damages with respect to practices in effect before December 1993. He has not established his claim in this regard. First, the evidence in this case, which focuses on the present practices, does not show the threshold actual infringement or substantial burden on Weir's beliefs with respect to the former practices. There is little in the record about the former practice other than what it was and conclusory claims as to its insufficiency.[8] Second, defendants have established their defense of qualified immunity. In his August 30, 1990 grievance in which he outlined nine "situations at I.S.P. chapel [that] are unsatisfactory," Exhibit 11, Weir complained that the number of fundamentalist services was less than in most churches and that the length of the service was "unsatisfactory ... to adequately meet the spiritual needs of inmates." In his subsequent grievance appeal Weir again commented that the time allotted for worship was inconsistent with "[e]very church I have been a part of...." *Id.* Weir did not relate his complaint in this regard to any tenet of his religion or explain why one hour per week was insufficient. He thus provided no basis for Nix and Helling to conclude one hour of group worship per week deprived him of a reasonable opportunity to exercise his religion. A reasonable prison official would not understand in these circumstances that one hour per week of group worship violated Weir's free exercise rights.

■ Weir asks the Court to order defendants to provide services on Sunday. The services for protective custody inmates are currently on Friday. Sunday worship is not included among the tenets of Weir's beliefs outlined in his doctrinal statement. While church services on Sunday are a tradition, the evidence does not show that fundamentalist Christianity mandates group religious worship on Sunday or any other day. The fact that Weir, as a protective custody in-

---

8. In his post-trial memorandum Weir notes he was denied visitation from a lay pastor on one occasion. He further notes lay pastors are now permitted to visit inmates. He does not appear to seek any relief with respect to the occurrence in question. Post–Trial Memorandum, at 6.

mate, cannot attend group worship services on Sunday does not infringe upon or substantially burden the exercise of his religion.[9]

■ Weir complains that the inability to take a Bible into the exercise yard is a denial of equal protection as well as a violation of his right to exercise his religion. The equal protection claim is grounded on Weir's belief that inmates in the general population are permitted to take Bibles into the yard whereas protective custody inmates are not. As noted in the Court's findings, the prison policy in question applies equally to both groups of inmates. The equal protection aspect of the complaint here fails for lack of proof of disparate treatment.

■ In view of Weir's other opportunities to study the Bible, its unavailability in the yard has little impact on his personal Bible study. Weir is unable to use the Bible in the yard for evangelism and spiritual counselling, but in view of Weir's knowledge of the Bible, the opportunity for weekly group Bible study, and the ability to use the Bible to prepare for evangelism and counselling in the yard, the burden on Weir's ability to engage in this part of his religious beliefs does not, in the Court's judgment, rise to the level necessary to invoke the compelling interest test. Hence no First Amendment or RFRA violation is established.

■ Nor has Weir shown that the limit of twenty-five magazines or books in a cell infringes upon or substantially burdens his religious beliefs. The single essential book for fundamentalist Christians is the Bible. Weir, from resources in his cell or available in the prison chapel, has reasonable access to religious dictionaries, treatises, commentaries and the like to aid in his study of the Bible. Moreover, Weir's desire to possess numerous research materials stems from a personal interest in religious scholarship apart from any tenet or belief central to fundamentalist doctrine. The *Parrott* decree does not require the prison to allow Weir to have the same number of books as inmates in "honor lifer" status. Whether ISP officials should be required to implement a protective custody version of honor lifer status is not an issue presented in this case.

■ The complete baptismal ceremony cannot be conducted in the chapel because there is no place for the immersion to occur. This part of the ceremony is conducted in the prison infirmary, generally with only the chaplain and the candidate present. Both the candidate and participants in the service are effectively denied an opportunity to participate in the entire baptismal ceremony as it is intended to be conducted. Baptism is a tenet or belief central to Weir's religion. He is denied a central part of the religious experience it represents. This results in a substantial burden on the exercise of his religion in this regard. As indicated in the Court's findings, defendants have not shown, indeed they have not attempted to show, the present practice furthers a compelling governmental interest or is the least restrictive means of furthering that interest. As a result, Weir is entitled to appropriate equitable relief. He does not appear to seek damages in this regard, nor could he in light of the fact he did not include this issue in his grievance to prison officials about the religious program at ISP beyond a brief reference in his grievance appeal statement that "a baptistery should be provided."

9. Weir argues that Iowa Code Section 904.511 gives him a statutory right to attend services on Sunday. The statute provides:

Any inmate, during the time of detention, shall be allowed for at least one hour on each Sunday or other holy day or in times of extreme sickness, and at other suitable and reasonable times consistent with proper discipline in the institution, to receive spiritual advice, instruction, and ministration from any recognized member of the clergy who represents the inmate's religious belief.

On its face the statute does not mandate an opportunity for group worship on Sunday, merely an opportunity to receive advice, instruction and ministration from a member of the clergy of the inmate's religion. The statute has apparently not been construed or interpreted by the Iowa Supreme Court. In any event, a violation of state law, without more, is not actionable under 42 U.S.C. § 1983. *State of Missouri v. Wochner*, 620 F.2d 183, 185 (8th Cir.), *cert. denied*, 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980). Of course, if Weir's view of the statute is adopted, the statute supports the view that one hour of worship per week is reasonable.

With respect to the Chick Publications, the Court has found, as Judge Bennett did with respect to the plaintiff in *Lyon,* that denial of the publications in question to Weir violated his right to free speech or expression under the First Amendment. Appropriate injunctive relief will be granted.

Weir has not established a right to recover damages with respect to the Chick Publications. There is little to indicate the personal involvement of former warden Nix and treatment director Helling in preventing Weir from receiving the publications. They are not subject to liability on a theory of respondeat superior, *Ouzts v. Cummins,* 825 F.2d 1276, 1277 (8th Cir.1987), nor does the evidence establish "corrective inaction amounting to 'deliberate indifference' or 'tacit authorization of the offensive [practices]'" so as to permit supervisory liability. *Lyon,* 803 F.Supp. at 1555 (quoting *Williams v. Willits,* 853 F.2d 586, 588 (8th Cir.1988)); *see also White v. Holmes,* 21 F.3d 277, 280 (8th Cir.1994). At most, Nix and Helling allowed the publication review process to work as it was intended. That in this instance the result offended the First Amendment does not present an occasion to place supervisory liability on them. Supervisory liability is usually not established by isolated occurrences, but rather results from a pattern of occurrences which permit an inference of deliberate indifference or tacit authorization. *See Howard v. Adkison,* 887 F.2d 134, 138 (8th Cir.1989).

As noted in the Court's factual findings, Weir has failed to establish Piper was involved in the rejection of the publications.

## IV.

### CONCLUSION

Weir is entitled to declaratory and injunctive relief concerning his inability to participate fully in the baptismal ceremony. Weir is entitled to injunctive relief permitting him to receive the Chick Publications described in the Court's findings. Weir is not entitled to recover any damages. With respect to all other issues presented by Weir, he has failed to prove defendants violated his right to the free exercise of religion guaranteed by the First Amendment and the Religious Freedom Restoration Act, and he has likewise failed to prove with respect to any such issue that defendants have violated Weir's right to equal protection of the laws or the decree in *Parrott v. Ray.* Specifically, Weir has failed to prove that defendants have treated him differently because of his religious beliefs or have failed to accord him an equal opportunity to exercise those beliefs.

Plaintiff having prevailed in part the Court will consider whether plaintiff is entitled to an award of attorney fees. Plaintiff may make application therefor as provided by Local Rule 22.

## V.

### ORDER FOR JUDGMENT

The Clerk shall enter judgment as follows:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the current practice with respect to the baptism of fundamentalist Christians in protective custody at the Iowa State Penitentiary, wherein inmates in attendance are not afforded an opportunity to witness the immersion portion of the ceremony, is a denial of plaintiff Weir's right to exercise his fundamentalist Christian religion as guaranteed to plaintiff by the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendants Nix and Helling, and their successors, are hereby enjoined from denying plaintiff an opportunity to witness the immersion portion of the baptismal ceremony involving fundamentalist Christians in protective custody;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendants Nix and Helling, and their successors, are enjoined from denying plaintiff Weir the Chick Publications described in the Court's findings and said defendants shall initiate appropriate action to ensure that the approved publication list is amended to allow the publications described;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that in all other respects judgment is entered in favor of the

defendants and against the plaintiff, and the Complaint is dismissed.

IT IS SO ORDERED.